

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-09-00402-CV

IN THE INTEREST OF B.G.D.,
A.J.D, AND J.B.D., MINOR
CHILDREN

----------

FROM THE 89TH DISTRICT COURT OF WICHITA COUNTY

----------

## OPINION

----------

## I. Introduction

Appellant Ricky Derzapf (Ricky) appeals the order granting Connie Johnson's (Connie) petition for grandparent visitation with Ricky's children. In seven issues, Ricky contends that the trial court abused its discretion by awarding visitation to Connie because Connie does not have standing, the trial court's judgment violates the law of the case, insufficient evidence supports the judgment, and the court-appointed expert's testimony should have been excluded. Ricky also seeks remand for reconsideration of his attorney's fees.

We reverse the trial court's judgment and remand the case for consideration of Ricky's attorney's fees.

## II. Background

### A. General Background and Connie's Original Suit for Custody

Ricky and Jennifer Derzapf were married in the mid-1990s and had two children: A.J.D., born in 1996; and J.B.D., born in 2000. B.G.D., born to Jennifer in 1991, is not Ricky's biological son, but Ricky adopted B.G.D. after he married Jennifer.[1] Jennifer was diagnosed with leukemia while pregnant with J.B.D. and passed away on June 3, 2001.

Connie is Jennifer's mother and B.G.D., A.J.D., and J.B.D.'s grandmother. For several months immediately following Jennifer's death, Connie and her husband, Randy Johnson, served as the children's primary caregivers. Ricky and the Johnsons initially worked cooperatively on the children's behalf, but tension between Ricky and the Johnsons increased once Ricky began reasserting himself as the children's primary caregiver. The Johnsons perceived Ricky as emotionally distant, and Ricky believed Connie was directly undermining his influence and authority over the children and assuming the role of mother instead of grandmother.

---

[1]Although Connie originally sought court-ordered grandparent visitation with B.G.D. when she filed this suit in 2004, visitation with B.G.D. is no longer at issue because B.G.D. became legally emancipated the week before trial.

On May 6, 2003, Connie and Randy filed an original suit affecting the parent-child relationship (SAPCR) seeking custody of the children and requesting that they be appointed sole managing conservators, and they obtained an ex parte temporary restraining order preventing Ricky from having possession of the children. Attached to the Johnsons' original petition were affidavits by Connie, Randy, and Connie's three sons. The Johnsons alleged in their petition and affidavits that Ricky endangered the children (particularly B.G.D.) and significantly impaired the children's physical health and emotional development. The affidavits also contained many critical assessments of Ricky's fitness as a parent and husband and included allegations of physical and verbal abuse. For example, Connie stated in her affidavit that Jennifer's stress from living with Ricky caused her immune system to "crash," ending her sixteen-month battle with leukemia. After a hearing, the trial court dissolved the temporary restraining order, returned the children to Ricky's conservatorship, and dismissed the case without prejudice. Ricky then cut the children off from any contact with the Johnsons.

**B. 2005 Temporary Grandparent Visitation Order**

Connie and Randy filed this lawsuit, a petition for grandparent access, on March 10, 2004. *See* Tex. Fam. Code Ann. § 153.433 (West Supp. 2010). In October 2005, the trial court conducted an evidentiary hearing on the Johnsons' request for a temporary order for grandparent visitation. Dr. Mark R. Otis, the court-appointed psychologist, testified at the temporary orders hearing that

Ricky's decision to cut off the Johnsons' access to the children was justified under the circumstances and that Ricky was understandably devastated, hurt, angry, and offended by the Johnsons' allegations. Indeed, Dr. Otis wrote in his 2005 report that "Connie contributed significantly more to the atmosphere of mistrust and hurt than Ricky or Randy."

Dr. Otis also observed in his 2005 report that, in the months following the original lawsuit and while the Johnsons did not have access to the children, Ricky had taken the children to a counselor; that B.G.D. and A.J.D. were prescribed anti-depressant medication; that the children's pediatrician concurred with Ricky's conclusion that further contact with the Johnsons would be harmful to the children's emotional well-being; that the children showed "significant improvement" in their "adjustment and personal well-being"; that B.G.D. and A.J.D. were taken off the anti-depressants; that the children were released from counseling; and that "collateral sources" had confirmed the children's improvement.

Despite the statements in his report, Dr. Otis also testified at the temporary orders hearing that the children were "clearly distraught" about losing their relationship with the Johnsons; that it makes A.J.D. sad to think about the Johnsons; that A.J.D. "potentially might have some difficulties down the line"; that A.J.D. and B.G.D. talk about the Johnsons "with a lingering kind of sadness, a yearning"; and that cutting the children off from the Johnsons "would not be healthy," would be harmful to their long-term psychological development, and

4

could cause them to be "emotionally damaged." But Dr. Otis also testified that the children's sadness had "not manifested as depression or behavioral problems or acting out" and that "sadness and yearning doesn't rise to a level of significant emotional impairment." Dr. Otis recommended that the children's visitation with the Johnsons begin in stages, first with Randy, then with the children's uncles, and later with Connie after she and her family attended counseling. After the hearing, the trial court signed an order granting the Johnsons visitation on the first Saturday of each month.

The children had visitations with the Johnsons for the next sixteen months. Ricky acknowledged that the visits went well. His only complaints were that the Johnsons' gifts were a "little excessive" and that the Johnsons had allowed B.G.D. to take his girlfriend to the lake with them, but he admitted that the Johnsons were not aware that B.G.D. had been grounded at the time from seeing his girlfriend.

## C. Ricky's Petition for Writ of Mandamus

Ricky sought mandamus relief after the trial court entered the temporary order granting grandparent visitation with the children. Although this court denied Ricky's petition, the supreme court granted it. *See In re Derzapf*, 219 S.W.3d 327, 331 (Tex. 2007) (orig. proceeding). The supreme court held that Randy did not have standing as a step-grandparent to seek grandparent access and that Connie had not met her statutory burden of proving that the children's physical health or emotional well-being would be significantly impaired in the absence of

5

visitation with her. *Id.* at 332–33, 333–34. After the supreme court's decision in March 2007, Ricky again denied the Johnsons any access to or visitation with the children outside of five meals and the children's extracurricular activities, which the Johnsons only learned of by communicating with B.G.D.

## D. Trial on the Merits

The case proceeded in the trial court after the supreme court's decision. For his part, Dr. Otis conducted a separate telephone interview with Ricky and Connie and two interviews with the children. He also conducted what he termed "collateral interviews" with Randy, Dr. Connell, Barbara Lyne (mother of one of B.G.D.'s friends), Sherry Cantu (friend of the Johnson family), and Sherri Booker (friend of Ricky and the children). Dr. Otis then issued an updated report dated September 8, 2008. Final trial on the merits before the court began on April 6, 2009, and the trial court heard testimony from seven fact witnesses and two expert witnesses.[2]

Ricky testified that his attitude toward Connie had not changed since 2005, that he was not bitter toward Connie, and that he was concerned that her past alienating behavior would continue in the future. He also testified that Connie's affidavit in support of the 2003 SAPCR suit (filed by Connie and Randy for sole custody of the children) was very destructive and caused a lot of his concern and mistrust.

---

[2]Ricky's attorney also testified concerning Ricky's attorney's fees.

6

Ricky also testified about the children's demeanor and improvement in 2003 and 2004 when they did not have contact with the Johnsons. The children spent almost a month in Houston with Ricky's sister-in-law and later started counseling, and B.G.D. and A.J.D. were initially prescribed anti-depressants. Ricky testified that he did not notice any problems with the children between 2003 when they stopped seeing the Johnsons and 2005 when the court-ordered visitations began and that the children were "very good, very well stabilized." He said that the children had very positive demeanors and that he did not observe the kids mourning or grieving.

Ricky testified that he and the children moved from Wichita Falls to Burkburnett in early 2007 because he could no longer afford the children's private school and because he had good friends in Burkburnett who could help him with the children. He said A.J.D. and J.B.D. play sports all year, that J.B.D. had been involved in dancing and singing activities, and that he had not observed any behavior in either child that caused him concern about their emotional states. Ricky testified that he had discussed the children's mother with them almost weekly; that he had talked with them regularly about what they were doing with school, sports, and their friends; and that he had shown them physical affection. He testified that J.B.D. was doing well in school and generally makes friends in any social situation. He also testified that A.J.D. is typically slower to make friends but that A.J.D. had surprisingly made friends in Burkburnett almost

7

immediately, and Ricky denied seeing the sadness, longing, and frustration in A.J.D. that Dr. Otis had reported.

Ricky admitted that his relationship with B.G.D. was somewhat different than his relationship with A.J.D. and J.B.D., but he denied treating B.G.D. differently. He agreed that his relationship with B.G.D. had become progressively worse, but he said that it began deteriorating before the court-ordered visitations stopped in March 2007. B.G.D. had started talking about leaving home and had exhibited more defiant behavior about breaking Ricky's rules, and Ricky testified that B.G.D. had said he would move to Connie's and that he and Connie had been planning the move for a long time.

Ricky agreed that Connie is an important person in A.J.D. and J.B.D.'s life and that the Johnsons provided them emotional nurturing, but he denied that Connie is a core relation for either of them. He testified that he believes he is emotionally connected with his children, that he does not believe they mourn the loss of contact with the Johnsons or yearn for more contact, and that he feels it is in A.J.D. and J.B.D.'s best interest for him to be present at any visitations with the Johnsons. Ricky also testified that Dr. Otis's graduated visitation recommendation was not in the children's best interest.

Ricky also denied that he had cut off all visitations with the Johnsons and testified that the children had been with them at five dinners and at as many as forty extracurricular activities over a two-year period. Ricky said that he was not comfortable with gifts the Johnsons had given the children but that he tried not to

8

show any negativity. He denied that he intended to discontinue all contact between the children and the Johnsons if not court-ordered.

Connie testified that Jennifer and B.G.D. lived with her before Jennifer and Ricky were married and that B.G.D. saw her every day during that time. She testified that she is emotionally bonded with all of the children. She said that she provided the children with emotional support when they lived with her following Jennifer's death and that Ricky had initially supported her role with the children. Connie also testified about the conflict that arose when Ricky decided that the children should live with him full time beginning in January 2003 and said that Ricky stonewalled her efforts to see the kids after that time and that Ricky had not voluntarily allowed her any access to the children between May 2003 and March 2004.

Connie testified that she had worked very hard since 2005 to avoid even the appearance of impropriety. She said she wanted Ricky "to understand that those kids love both of us" and that she "want[ed] to let those kids love both of us because that's what's in their best interest." Connie described the court-ordered visitations and testified that they went very well, that she reconnected with the children, that it was nurturing for the children to have the visitations, and that the children see her as someone with whom it is safe to talk about their mother. She testified that she was very concerned that Ricky did not recognize the emotions that the children reported to Dr. Otis, that Ricky did not encourage the children to be their own person or to express their feelings, and that she believed she could

9

provide the children with emotional support. However, Connie agreed that A.J.D. and J.B.D. were "bonded and feel comfortable" with Ricky. Even so, she testified that she believed the children's emotional well-being would be significantly impaired if visitations with her were not resumed.

On cross-examination, Connie agreed that her 2003 affidavit was hurtful and damaging, but she testified that she stood by the statements in the affidavit and that "facts don't change." She also admitted telling B.G.D. in a 2003 letter that he could divorce his father. And although she admitted that Ricky adequately fed, clothed, and sheltered the children, she testified that Ricky was not a fit parent because he did not emotionally nurture the children. Finally, although Connie testified that she wanted court-ordered visitation with the children, she also testified that she just wanted to be a grandparent and enjoy her grandchildren "like [her] friends get to enjoy theirs."

Dr. Mary Connell is a forensic and clinical psychologist who has studied alienating behaviors and had worked with Connie since late 2004. She described parental alienation as someone trying to turn a child against a parent, and she testified that she had worked with Connie to give her insight into her tendency toward alienation and to help her learn to interact with Ricky and the children in a positive and respectful manner.

Dr. Connell described Connie as "quite humbled" in 2004 and testified that Connie understood the egregious and destructive nature of her past behavior. Dr. Connell testified that Connie had "absolutely succeeded in eradicating the

10

alienating language from her behavior and the impulses to alienate." She said that Connie's first reflex was now "generally neutral to positive on Ricky." Based primarily on information relayed to her by Connie, Dr. Connell testified that Connie nurtured the children's emotional needs during the court-ordered visitations and that Connie provided J.B.D. specifically with a same-sex role model and a person who could provide information about her mother. Although Dr. Connell testified that Connie had "been an exemplar for positive work in . . . eradicating those [alienating] behaviors," she also agreed that the recidivism rate for persons exhibiting alienating behavior is quite strong[3] and that most of Connie's underlying perceptions of Ricky remain negative.

B.G.D. testified that his petition for emancipation was granted a week before trial. He said that emancipation was his idea and that he had heard about the concept years earlier from a girl at his school. He described living with Ricky as "pretty bad" and said that he was depressed, wanted to be left alone, and did not want to associate with anyone. B.G.D. testified that his relationship with Ricky had always been "emotionally distant," that he felt Ricky had treated him as a child Ricky was forced to take care of, that Ricky's relationship with A.J.D. was different, and that Ricky had never put his arms around him and said that he loved him. B.G.D. admitted on cross-examination, however, that Ricky had put his arms around him and said that he loved him and that Ricky taught him to

---

[3]Dr. Connell testified at the 2005 temporary orders hearing that parental alienation is intractable and "a very difficult phenomenon to treat."

shoot a gun; worked with him to install speakers in his car; took him hunting; and was there when he shot his first deer and first and second turkeys.[4] B.G.D. denied being manipulated or influenced by Connie to move into her home, but he admitted that Connie bought him a one-year-old Mustang convertible within two weeks of moving into her house and that, unlike Ricky, Connie allowed him to have earrings and wear his hair long.[5]

B.G.D. also testified that he had "disowned" Ricky, that he no longer considered Ricky his father, and that he planned to change his name to McAffey (his mother's maiden name). B.G.D. also admitted telling Dr. Otis that "the rebel would come and go" in him and that he believed Ricky's rules, such as curfew and not being home with his girlfriend when Ricky was not present, were unreasonable. Finally, B.G.D. admitted swinging at and choking Ricky in January 2008 after Ricky had grounded him from seeing a new girlfriend.

Randy testified that when B.G.D. moved into their home, he and Connie also had problems with B.G.D. following their rules. Randy said that he and Connie discussed the matter with B.G.D. and that after several months, B.G.D.

---

[4]Dr. Otis testified that B.G.D.'s description of his relationship with Ricky was not entirely accurate; B.G.D.'s relationship with Connie predated Ricky's, and B.G.D. had a different relationship with Ricky than J.B.D. and A.J.D. and was depressed before he moved. However, Dr. Otis believed that B.G.D.'s trial testimony was an attempt to justify his decisions to seek emancipation and move into Connie's home.

[5]Connie denied encouraging or bribing B.G.D. to move into her home and testified that she advised him to think seriously about doing so, but she also told B.G.D. that she would not turn him away if he decided to move in with her.

12

began following their rules and being respectful. Randy denied that he and Connie had bribed B.G.D. into coming to live with them and said that he had required B.G.D. to work to earn additional spending money.

Randy reported positively about the court-ordered visitations and described how J.B.D. sometimes cried and asked to spend the night when the visitations were over. He also testified that the children, when they had seen the Johnsons at extracurricular activities or the scheduled meal visits, were hesitant to show a great deal of affection when Ricky was present but that they had acted differently when Ricky was not present. Randy also testified that he had promised the children's mother that the children would be close to the Johnsons throughout their lives, that he believed it was "terrible" that B.G.D. wanted to disown Ricky and change his name, but that he believed Ricky was making decisions that made him an unfit parent.

Greg Johnson, the children's uncle, testified that he attended each of the sixteen court-ordered visitations, that the children had loving interactions with Connie during the visits, that the children were very emotionally bonded with Connie, and that the children would benefit from seeing Connie. Greg also described an incident before Jennifer's death in which he believed Ricky played too roughly with B.G.D. and then ridiculed B.G.D. for crying.

Tammy Derzapf is Ricky's sister-in-law. She described Ricky as "quiet, kind of introverted, but very loving, a very caring person. Just very genuine." She also testified that she believed Ricky to be "very much" emotionally in tune

13

with the children's feelings and that she had not seen the children exhibit reluctance to share their feelings with him.

Tammy testified that the children had extended summertime visits with her in Houston each year, beginning in 2003 shortly after the Johnsons' original SAPCR filing. Tammy testified that B.G.D. said in 2003 that he did not want to participate in their family prayer before dinner because he did not want to go against Connie's wishes. In 2004, Tammy observed that the kids were happy and that B.G.D. was not as mean to A.J.D. as he had been in 2003. Tammy testified that the children's demeanor was also good in 2005 and that they did not seem to be sad, depressed, grieving, or mourning, but she said that "something had changed" in 2006. A.J.D. and J.B.D. were doing well in 2006, but she said that B.G.D. was not happy, was very mean to A.J.D., and was confused and distrustful. In 2008, only A.J.D. and J.B.D. visited, and Tammy observed that A.J.D. was more relaxed than he had been in a long time and made friends with several neighborhood kids.

Steve Booker is an attorney in Burkburnett, and he and his wife Sherry are Ricky's close friends. Steve and Sherry had seen Ricky and the children two to three times per week during at least the previous year. Steve described A.J.D. as quiet but "all boy," and he testified that A.J.D. had "a bunch of friends" that often visited him at Ricky's house. He described J.B.D. as a "pistol" and "happy go lucky" and said she always wanted to be the center of attention. Steve testified that he had not seen the children exhibit any lingering sadness,

14

depression, or frustration and that he perceived Ricky as sensitive to the children's emotional needs.

Dr. Otis testified that Ricky was resentful of and did not trust Connie, that Connie was no longer bitter at Ricky and was managing her past alienating behavior, and that the children had observed her changed attitude. Dr. Otis testified that the children renewed their attachments to the Johnsons during the court-ordered visitations, but he said that the current level of contact was not meeting their emotional needs. Dr. Otis testified that A.J.D. in particular "yearns" for more contact with the Johnsons, that A.J.D. would feel "deep disappointment" if not allowed to see the Johnsons regularly, that A.J.D. "grieves" not seeing them, and that A.J.D.'s deep disappointment could "potentially manifest itself into potential depression" and could "potentially manifest itself in anger at Ricky." He testified that there was a "high probability" that denying A.J.D. visitation with Connie would significantly impair A.J.D.'s emotional well-being, but he also said that A.J.D. was "very bonded" with Ricky, was not affected by Ricky's negativity toward Connie, and did not want anything to interfere with his living with Ricky.

Dr. Otis described J.B.D. as very social, extroverted, affectionate, and forthcoming, and he testified that she "gets a great deal of social support just about everywhere she turns." He said that J.B.D.'s level of distress was "much less" than A.J.D.'s and that there was "some probability" of significant impairment to J.B.D.'s emotional well-being in the absence of visitation with Connie. Dr. Otis acknowledged, however, that he could not isolate Connie from the rest of her

15

family and say that significant impairment to the children's emotional well-being would occur just because of a denial of visitation with Connie. Finally, Dr. Otis recommended in his 2008 report that "putting controls in place, such as the [graduated visitation schedule he] recommended in the initial evaluation would be helpful and important."

## E. Trial Court Orders Grandparent Visitation

After trial, the trial court signed a judgment ordering grandparent visitation with Connie on the third Saturday of each month and denying Ricky's request for attorney's fees. Connie submitted 107 findings of fact and conclusions of law that the trial court signed without revision or modification.[6] This appeal followed.

## III. Connie Has Standing

Ricky contends in his second issue that Connie does not have standing to seek grandparent access "because she failed to meet an express element of section 153.433 of the Texas Family Code." *See* Tex. Fam. Code Ann. § 153.433. Specifically, Ricky argues that the denial of possession or access is an express element of a grandparent's claim for possession or access under section 153.433 and that there is no evidence that the children were cut off from Connie.

---

[6]We have reviewed each of the trial court's findings of fact and note that many are not supported by any evidence in the record. *See generally McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986) (stating that unchallenged findings of fact "are binding on an appellate court unless the contrary is established as a matter of law, or if there is no evidence to support the finding"); *Rischon Dev. Corp. v. City of Keller*, 242 S.W.3d 161, 166 (Tex. App.—Fort Worth 2007, pet. denied), *cert. denied*, 129 S. Ct. 501 (2008) (same).

16

Although we agree that the denial of possession of or access to the child is an express element a grandparent must prove to obtain access pursuant to section 153.433, *see In re J.M.T.*, 280 S.W.3d 490, 493 (Tex. App.—Eastland 2009, no pet.), a grandparent's standing is not conferred by section 153.433. Rather, a grandparent's standing to seek possession or access to a child is conferred by section 153.432. *In re Smith*, 260 S.W.3d 568, 572–73 (Tex. App.—Houston [14th Dist.] 2008, orig. proceeding); *see* Tex. Fam. Code Ann. § 153.432 (West Supp. 2010). "Although a successful access suit might require the grandparent to satisfy section 153.433, whether the grandparent ultimately will succeed is a different question than whether the grandparent has the right simply to bring suit." *Smith*, 260 S.W.3d at 573. Section 153.432(a) provides that "a biological or adoptive grandparent may request possession of or access to a grandchild by filing: (1) an original suit; or (2) a suit for modification as provided by [family code] chapter 156." Tex. Fam. Code Ann. § 153.432(a). It is undisputed that Connie is the biological grandmother of the children. She therefore has standing pursuant to section 153.432 to seek possession of or access to the children, and we overrule Ricky's second issue. *See id.*; *Smith*, 260 S.W.3d at 572–73.

## IV. Significant Impairment

Ricky contends in his first issue that the trial court violated the law of the case because "virtually nothing has changed" since the supreme court granted his petition for a writ of mandamus. Specifically, Ricky argues that although Dr.

17

Otis modified his testimony by "attempting to use the magic buzz words," Dr. Otis's underlying observations and conclusions "have not changed at all."

## A. Applicable Law

### 1. Texas Family Code Section 153.433(a)

"The Legislature set a high threshold for a grandparent to overcome the presumption that a fit parent acts in his children's best interest: the grandparent must prove [by a preponderance of the evidence] that denial of access would '*significantly impair*' the children's physical health or emotional well-being." *Derzapf*, 219 S.W.3d at 334 (citing Tex. Fam. Code Ann. § 153.433(a)(2)). This high threshold exists so that a court will refrain from interfering with child-rearing decisions made by a parent simply because the court believes that a "better decision" could have been made. *See id.* at 334 (quoting *Troxel v. Granville*, 530 U.S. 57, 73, 120 S. Ct. 2054, 2064 (2000)). This standard recognizes that "so long as a parent adequately cares for his or her children (i.e., is fit), there will normally be no reason for the State to inject itself into the private realm of the family." *Id.* at 333 (quoting *In re Mays-Hooper*, 189 S.W.3d 777, 778 (Tex. 2006) (orig. proceeding)).

We review a trial court's decision to grant a grandparent's request for access or possession for an abuse of discretion. *In re Chambless*, 257 S.W.3d 698, 699 (Tex. 2008); *Derzapf*, 219 S.W.3d at 333. A trial court abuses its discretion if it grants access to grandchildren when the grandparent has not proven that denying the grandparent access to the child would significantly impair

18

the child's physical health or emotional well-being. *In re Scheller*, 325 S.W.3d 640, 643 (Tex. 2010) (orig. proceeding) (quoting *Derzapf*, 219 S.W.3d at 333). This is so because "a trial court has no discretion in determining what the law is or applying the law to the facts, even when the law is unsettled." *Derzapf*, 219 S.W.3d at 333 (quoting *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 135 (Tex. 2004) (orig. proceeding)).

### 2. Law of the Case

"The 'law of the case' doctrine is defined as that principle under which questions of law decided on appeal to a court of last resort will govern the case throughout its subsequent stages." *Loram Maint. of Way, Inc. v. Ianni*, 210 S.W.3d 593, 596 (Tex. 2006) (quoting *Hudson v. Wakefield*, 711 S.W.2d 628, 630 (Tex. 1986)). The doctrine may be applied when an issue has been resolved on the merits in a prior mandamus proceeding. *See In re Cantu de Villarreal*, 330 S.W.3d 11, 20–21 (Tex. App.—Corpus Christi 2010, no pet.) (holding law of the case doctrine prevented reconsideration of issue decided in earlier mandamus petition); *Landerman v. State Bar of Tex.*, 247 S.W.3d 426, 433 (Tex. App.—Dallas 2008, pet. denied) (stating "[r]eview of a trial court's action under the abuse of discretion standard is a question of law"); *see also In re A.T.M.*, No. 12-07-00243-CV, 2009 WL 1492832, at *3 (Tex. App.—Tyler May 29, 2009, pet. denied) (mem. op.) (stating prior holding as to whether abuse of discretion occurred was question of law, noting facts previously presented were

19

"substantially the same," and holding prior mandamus denial was law of the case).

"By narrowing the issues in successive stages of the litigation, the law of the case doctrine is intended to achieve uniformity of decision as well as judicial economy and efficiency. The doctrine is based on public policy and is aimed at putting an end to litigation." *Briscoe v. Goodmark Corp.*, 102 S.W.3d 714, 716 (Tex. 2003) (quoting *Hudson*, 711 S.W.2d at 630). The doctrine applies only to questions of law rather than questions of fact, and it "does not necessarily apply when either the issues or the facts presented at successive appeals are not substantially the same as those involved on the first trial." *Hudson*, 711 S.W.2d at 630. Indeed, the decision to revisit a previous holding is left to the discretion of the court under the particular circumstances of each case. *City of Houston v. Jackson*, 192 S.W.3d 764, 769 (Tex. 2006). In other words, a reviewing court may apply the law of the case doctrine in a subsequent proceeding if the facts in the later proceeding are "so nearly the same [as the earlier proceeding] that they do not materially affect the legal issues involved in the later proceeding." *Lawrence v. City of Wichita Falls*, 122 S.W.3d 322, 326 (Tex. App.—Fort Worth 2003, pet. denied).

## B. Discussion

To determine whether we should apply the law of the case doctrine, we must compare the evidence from the 2005 temporary orders hearing (upon which

the supreme court granted Ricky's petition for a writ of mandamus) and the evidence from the 2009 trial on the merits.

### 1. Dr. Otis's 2005 Testimony

Dr. Otis testified in 2005 that Ricky had legitimate reasons to be concerned about Connie's influence over the children and that he had appropriately cut off the children's contact with Connie. Discussing the Johnsons' allegations in their 2003 SAPCR suit, Dr. Otis testified that he did not believe the accusations to be true and that Ricky was justifiably devastated, hurt, angry, and offended. Dr. Otis agreed that he had not seen any evidence that Ricky was an unfit parent or had provided the children with an unsafe environment.

Dr. Otis described J.B.D., five years old at the time, as very outgoing, animated, enjoyable, loving, and "just a delight." He said that she had never met a stranger, loved being the center of attention, "connect[ed] extremely well," and was "very attached to her brothers and to her father."

Dr. Otis testified that the children, particularly B.G.D. and A.J.D., were "clearly distraught" about the loss of their relationship with the Johnsons and that A.J.D. was "the one that potentially might have some difficulties down the line." He said A.J.D. "had the most emotional reaction during the [joint] session with the Johnsons in terms of being tearful and a little bit distraught." Dr. Otis testified that A.J.D. and B.G.D. had a "lingering sadness" about the lack of contact with the Johnsons, and he said that they talked about their grandparents "with a lingering kind of sadness, a yearning." But Dr. Otis also said that the sadness

21

had "not manifested as depression or behavioral problems or acting out," and he agreed that "sadness and yearning doesn't rise to a level of significant emotional impairment."

Dr. Otis also testified that the Johnsons had a great deal to offer the children, including a connection to their deceased mother and a sense of loving stimulation, belonging, family, warmth, and security. He testified that the Johnsons "have had important attachments to the children," that it "would not be healthy to cut them off," that it would be harmful to the children's long-term psychological development, and that the children would be "emotionally damaged" if visitations with the Johnsons were not resumed. Dr. Otis recommended that the children first renew contact with Randy and their uncles and that Connie be integrated into the visitation plan after counseling. Dr. Otis did not recommend renewed contact with Connie alone.

After the temporary orders hearing, the trial court granted the Johnsons' request for visitation with the children.

### 2. The Supreme Court's 2007 Opinion

The supreme court granted Ricky's petition for a writ of mandamus and held that the trial court abused its discretion by ordering grandparent visitation. *See Derzapf*, 219 S.W.3d at 331. The supreme court held that Connie was required to "overcome the statutory presumption that denying the children access to her in particular—not Connie and Randy jointly or the Johnson family as a whole—would significantly impair the children's physical health or emotional well-

22

being," and the court noted that Dr. Otis's testimony related to a denial of access to both her and Randy or to the Johnson family as a whole and "d[id] not support renewed contact with Connie alone." *Id.* at 333. The court also mentioned Dr. Otis's observation of lingering sadness and stated that "[w]hile it is true that Dr. Otis believed the children would benefit from renewed contact with the Johnson family, he did not testify that denying Connie access to her grandchildren would significantly impair the children's physical or emotional health." *Id.* Thus, although Dr. Otis testified that the children experienced lingering sadness and yearning due to the loss of contact with the Johnsons, that the children would be emotionally damaged without access, and that denying access to the Johnsons would be harmful to the children's long-term psychological development, the supreme court held that Connie had not met her burden of proving that denying her access to the children would significantly impair their physical health or emotional well-being. *Id.* at 334.

### 3. Dr. Otis's 2009 Testimony

Subsequent to the supreme court's grant of mandamus relief in March 2007, Dr. Otis conducted separate telephone interviews with Ricky and Connie, and he interviewed the children once as a group and once separately.[7] Dr. Otis

---

[7]Dr. Otis did not serve as the children's counselor in any capacity, and he did not see or talk to them in the nearly three years since preparing his initial report.

23

also interviewed the mother of one of B.G.D.'s friends, a friend of the Johnson family, and one of Ricky's friends.

Dr. Otis testified at trial that the children renewed their attachments to Connie and the Johnsons during the court-ordered visitations and that the children felt comfortable, accepted, and part of the family. He further opined that the current level of contact was not meeting A.J.D.'s and J.B.D.'s emotional needs. Dr. Otis testified that A.J.D. "yearns" for more contact with the Johnsons and strongly wanted more contact. A.J.D. told Dr. Otis that he felt mad, sad, and hopeless about not being able to see the Johnsons, and Dr. Otis opined that A.J.D. would feel "deep disappointment" if he could not see the Johnsons regularly and that it was important for A.J.D. to have resumed visitation. He said that A.J.D.'s deep disappointment could "potentially manifest itself into potential depression" and could "potentially manifest itself in anger at Ricky," that A.J.D. "grieves" not seeing the Johnsons, that being cut off from the Johnsons is an aspect to the grief and loss of his mother, and that A.J.D.'s feelings of hopelessness and despair "could" affect his well-being. After further questioning, Dr. Otis testified that there is a "high probability" that denying A.J.D. visitation with Connie would significantly impair A.J.D.'s emotional well-being. However, Dr. Otis testified that A.J.D. did not want anything to interfere with his living with Ricky, that A.J.D. was not affected by any negativity Ricky feels toward Connie, and that there was "no question" that A.J.D. was "very bonded with his father." Dr. Otis concluded his 2008 report by stating that if visitations are not resumed,

24

"the children, particularly A.J.D., may benefit from psychotherapy to help them work through their feelings of frustration and grief."

Discussing J.B.D., Dr. Otis said that she experienced the visitations with the Johnsons very positively. However, he testified that J.B.D.'s level of distress was "much less" than A.J.D.'s and that there was "some probability" that denying J.B.D. visitation with Connie would significantly impair her emotional well-being. Dr. Otis described J.B.D. as very social, extroverted, affectionate, and forthcoming and said she "gets a great deal of social support just about everywhere she turns."

On cross-examination, Dr. Otis agreed that the children had exhibited significant improvement when they had no access to the Johnsons. Dr. Otis also agreed that, as of the time of his 2008 report and although they again had little contact with the Johnsons, A.J.D. and J.B.D. liked their new schools, were developing rewarding friendships, and were doing well academically. In fact, Dr. Otis admitted that A.J.D. and J.B.D. were in good medical health and achieving "in spite of" their infrequent contact with B.G.D. and the Johnsons. Dr. Otis also acknowledged the possibility that Connie could impose onto A.J.D. and J.B.D. the type of negative influence she had previously imposed onto B.G.D., and Dr. Otis testified that the possible negative influence from Connie should be a matter of concern to Ricky.

Moreover, Dr. Otis testified that A.J.D. did not list Connie as being within his "core group" of relationships, instead listing only Ricky, B.G.D., and one of his

uncles. J.B.D. listed Connie in her core group, but she also listed Ricky; each of her aunts, uncles, cousins, grandparents; and Ricky's friends Sherri and Steve Booker. In fact, Dr. Otis acknowledged that he could not isolate Connie from the rest of her family and say that significant impairment to the children's emotional well-being would occur just because of a denial of visitation with Connie. Finally, Dr. Otis again recommended a graduated visitation schedule that integrated Connie after initial visitation with Randy and the children's uncles.

### 4. The Law of This Case

In its 2007 opinion granting mandamus relief from the 2005 temporary visitation order, the supreme court held that Connie is required to prove that denying access to her alone, as opposed to her and the rest of her family, would significantly impair the children's emotional well-being. *Derzapf*, 219 S.W.3d at 333. The supreme court then stated with respect to Dr. Otis's 2005 report and testimony at the temporary orders hearing:

> While it is true that Dr. Otis believed the children would benefit from renewed contact with the Johnson family, he did not testify that denying Connie access to her grandchildren would significantly impair the children's physical or emotional health. *Dr. Otis's testimony pertained either to both Connie and Randy or to the Johnson family as a whole, but his recommendations do not support renewed contact with Connie alone.* To the contrary, Dr. Otis noted that Ricky had a reasonable interest in preserving "the children's hard-won feelings of peace and security" regained after contact with Connie ceased.
>
> Dr. Otis's report concluded that the children should first have renewed contact with Randy, then with the Uncles and extended family, and only later with Connie. Dr. Otis testified that his recommendation "was based on the strength that [he] perceived that

26

the grandfather, Randy has." In fact, Dr. Otis testified that he could not recommend visitation with Connie, absent supervision, as Connie's problems controlling her impulses could be "very influential" and detrimental to the children.

> *And while Dr. Otis testified that it may be harmful for Ricky to cut off the Johnsons' access to B.G.D. in particular and that it was in the children's best interest that they have some contact with their grandparents, his testimony does not support awarding Connie access over Ricky's objection.* According to Dr. Otis, "[t]he manner in which she resisted the children transitioning to [Ricky's] full-time care interfered with the children's emotional and behavioral adjustment." He also concluded that Connie actively attempted to alienate B.G.D. from his father and that her behavior was "very damaging" to the parent-child relationship. *Moreover, while Dr. Otis noted the children's "sadness" at being unable to see their grandparents, he admitted that these feelings did not rise to the level of a significant emotional impairment.*

*Id.* at 333–34 (emphasis added). The court then held that Connie had failed to meet the "high threshold" required by section 153.433(a)(2) for obtaining access to the children over Ricky's objection. *Id.* at 334.

### 5. Dr. Otis's Observations Did Not Change

There is no substantive difference between Dr. Otis's 2005 and 2009 testimony. Dr. Otis did not state in his 2008 report that A.J.D. or J.B.D. might suffer significant emotional impairment from a denial of visitation with Connie, stating instead that A.J.D. and J.B.D. "are at risk to experience more psychological harm if they are cut off from further involvement with Connie and the Johnson family than if they have contact." And although Dr. Otis changed his ultimate conclusion in 2009 (while testifying at trial in response to questions by Connie's lawyer) to a "high probability" of significant emotional impairment for

27

A.J.D. and "some probability" of significant emotional impairment for J.B.D., the observations underlying his 2005 and 2009 opinions were no different. In both instances, Dr. Otis described the benefits the children gained from access to the Johnsons and the lingering sadness, yearning, and grief the children would experience in the absence of visitations. The supreme court has already held in this case that lingering sadness, yearning, and grief from the lack of access coupled with the inability to segregate Connie from her family and the benefits gained from access do not rise to the level of significant emotional impairment required by section 153.433. *See Derzapf*, 219 S.W.3d at 333–34; *see also Scheller*, 325 S.W.3d at 643–44 (holding trial court abused its discretion by issuing temporary order for grandparent visitation even though the grandchildren had displayed anger, had experienced isolated bed wetting and nightmares, and had suffered the impact of losing their mother).

### 6. Connie's Arguments

Connie argues that the law of the case doctrine does not apply because the supreme court addressed a question of fact, not a question of law, when it held that the trial court abused its discretion by entering the temporary order. We disagree because "[r]eview of a trial court's action under the abuse of discretion standard is a question of law." *Landerman*, 247 S.W.3d at 433 (citing *El Dorado Motors, Inc. v. Koch*, 168 S.W.3d 360, 368 (Tex. App.—Dallas 2005, no pet.); *see In re A.T.M.*, 2009 WL 1492832, at *3 (stating that prior holding as to whether abuse of discretion occurred was a question of law).

28

Connie also argues that the issues now presented are not identical to those determined by the supreme court because the supreme court addressed whether Randy had standing and "whether the evidence presented at the temporary hearing in 200[5] showing that the denial of access to *both* grandparents would significantly impair the children's emotional well-being was also sufficient to show significant impairment as to Connie *alone*." Again, we disagree. The supreme court addressed the issue of whether the trial court abused its discretion by awarding grandparent access, and it held that Randy did not have standing and that Connie had not overcome the presumption that a fit parent acts in his children's best interest by proving that denial of access would significantly impair the children's physical health or emotional well-being. *Derzapf*, 219 S.W.3d at 332–34. The question presented in this appeal is likewise whether the trial court abused its discretion by awarding visitation to Connie when she allegedly failed to overcome the presumption that a fit parent acts in his children's best interest by proving that denial of access would significantly impair the children's emotional well-being. Thus, we cannot agree that the issue now presented differs to such an extent from that in the mandamus proceeding to make the law of the case doctrine inapplicable.

Finally, Connie argues that the facts at trial are "dramatically different" than those at the time of the temporary orders hearing. She first points to Dr. Otis's trial testimony and opinions, but we have already discussed the striking similarities in Dr. Otis's testimony from the temporary orders hearing and the trial

29

and need not repeat them here. Connie also points to Ricky's alleged "extreme" alienation of B.G.D. But Ricky's and Connie's respective relationships with B.G.D. are indisputably different than Ricky's and Connie's respective relationships with A.J.D. and J.B.D., and they were indisputably different at the time of the temporary orders hearing.

First, Dr. Otis testified that B.G.D.'s description of his strained and emotionally distant relationship with Ricky was not entirely accurate because B.G.D. was attempting to justify his decision to emancipate and move into Connie's home. Moreover, Dr. Otis testified that B.G.D.'s and A.J.D.'s experiences are not equivalent. In fact, Dr. Otis was impressed by A.J.D.'s ability to think for himself, to have his own point of view, and to not be affected by Ricky's negative feelings about Connie or B.G.D.'s negative feelings about Ricky; and he offered a similar opinion of J.B.D.'s objective view of the conflict between Ricky and the Johnsons. More importantly, Dr. Otis testified that there was more going on with B.G.D. than either Ricky or Connie understood. Dr. Otis described B.G.D.'s condition as the "sleeper effect" and explained that his recent experience with girlfriends had activated his feelings of loss of his mother in a way that B.G.D. did not understand and that caused an "almost panicky desperate yearning for that kind of relatedness that he had with his mother at one time and ha[d] lost." Dr. Otis testified that A.J.D.'s and J.B.D.'s relationships with Ricky are "far different" than B.G.D.'s, saying that A.J.D. and J.B.D. are "very securely attached to their dad. They love him dearly. They don't ever want that

30

to be jeopardized. They feel very secure living with him in relation to him. They don't share the animosity or the oppositionality or the resentment that [B.G.D.] experiences toward his dad." Finally, grandparent visitation with B.G.D. is not at issue in this appeal. Thus, B.G.D.'s situation is not comparable to A.J.D.'s or J.B.D.'s, and we are not convinced that B.G.D.'s changed relationship with Ricky sufficiently altered the factual landscape of this case to make the law of the case doctrine inapplicable, particularly when Dr. Otis used identical terms to describe A.J.D.'s and J.B.D.'s emotional states both before and after B.G.D.'s relationship with Ricky changed.

### 7. The Trial Court Abused Its Discretion

The circumstances of this case are unfortunate, as are the circumstances in many grandparent-access cases. As Justice Kennedy wrote in his dissent in *Troxel*,

> It must be recognized, of course, that a domestic relations proceeding in and of itself can constitute state intervention that is so disruptive of the parent-child relationship that the constitutional right of a custodial parent to make certain basic determinations for the child's welfare becomes implicated . . . . If a single parent who is struggling to raise a child is faced with visitation demands from a third party, the attorney's fees alone might destroy [the parent's] hopes and plans for the child's future. Our system must confront more often the reality that litigation can itself be so disruptive that constitutional protection may be required; and I do not discount the possibility that in some instances the best interests of the child standard may provide insufficient protection to the parent-child relationship. We owe it to the Nation's domestic relations structure, however, to proceed with caution.

31

530 U.S. at 101, 120 S. Ct. at 2079 (Kennedy, J., dissenting). While Justice Kennedy was responding to whether something more than a best-interests standard should govern third-party access suits, Justice Kennedy's observations are especially poignant, particularly in cases like this one.

Ricky is a single parent who, by all accounts, adequately feeds, clothes, and shelters his children, and his fitness as a parent is demonstrated by A.J.D.'s and J.B.D.'s significant emotional and social improvement in the years following their mother's death. Of course, Connie and her family believe, with support from Dr. Otis, that Ricky could outwardly exhibit more emotion when interacting with his children, but courts must tread lightly when interfering with a fit parent's decision to limit his children's access to their extended family. As Justice O'Connor wrote for the plurality in *Troxel*, "In an ideal world, parents might always seek to cultivate the bonds between grandparents and their grandchildren. Needless to say, however, our world is far from perfect, and in it the decision whether such an intergenerational relationship would be beneficial in any specific case is for the parent to make in the first instance." *Id.* at 70, 120 S. Ct. at 2062.

Because our state supreme court previously held that the trial court abused its discretion by ordering grandparent visitation to Connie based on testimony by Dr. Otis that does not substantively differ from Dr. Otis's trial testimony, we hold that the trial court abused its discretion by granting, over Ricky's objection, Connie's petition for grandparent visitation. *See Scheller*, 325

32

S.W.3d at 643–44; *Derzapf*, 219 S.W.3d at 334. We therefore sustain Ricky's first issue.[8]

## IV. Attorney's Fees

In his seventh issue, Ricky asks that we remand the case to the trial court for further consideration of his request for attorney's fees. "The award of attorney's fees in a suit affecting the parent-child relationship is within the trial court's discretion." *Bruni v. Bruni*, 924 S.W.2d 366, 368 (Tex. 1996); *see* Tex. Fam. Code Ann. § 106.002(a) (West 2008). Given our disposition of Ricky's first issue, Ricky is now the prevailing party in this litigation. Although Ricky's status as the prevailing party is only one consideration in the trial court's exercise of discretion when deciding whether to award him attorney's fees, remand for reconsideration of the recoverability of Ricky's fees is appropriate. We therefore sustain Ricky's seventh issue and remand this case to the trial court so that the trial court may reconsider whether Ricky should recover attorney's fees from Connie. *See Bruni*, 924 S.W.2d at 368–69 (remanding case to permit trial court to reconsider attorney's fee award in light of decision on appeal).

---

[8]Given our disposition of Ricky's first issue, we do not reach his third through sixth issues. *See* Tex. R. App. P. 47.1 (requiring appellate court to address "every issue raised and necessary to final disposition of the appeal").

33

## V.  Conclusion

Having overruled Ricky's second issue; having sustained his first and seventh issues; and having not reached his third, fourth, fifth, or sixth issues, we reverse the trial court's judgment and remand this case to the trial court for further proceedings consistent with this opinion.

ANNE GARDNER
JUSTICE

PANEL:  GARDNER, WALKER, and MCCOY, JJ.

DELIVERED:  August 25, 2011