

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-11-00209-CV

IN THE INTEREST OF A.B. AND
H.B., CHILDREN

----------

FROM THE 322ND DISTRICT COURT OF TARRANT COUNTY

----------

## OPINION ON APPELLEES' MOTION FOR REHEARING AND MOTION FOR EN BANC RECONSIDERATION[1]

----------

### I. Introduction

Appellees Department of Family and Protective Services (DFPS) and Intervenors (the children's foster parents) filed motions for rehearing and for en banc reconsideration of our opinion issued September 13, 2012. We grant the

---

[1]*See* Tex. R. App. P. 49.7.

motions, withdraw our opinion and judgment of September 13, 2012, and substitute the following.

This is the second time that Father has appealed the termination of his parental rights to A.B. and H.B. *See In re A.B.*, No. 02-09-00215-CV, 2010 WL 2977709 (Tex. App.—Fort Worth July 29, 2010, no pet.) (mem. op.).

As we detailed in our first opinion, A.B. and H.B. were placed with family members in September 2007 after then fifteen-month-old H.B., weighing only fifteen pounds, was admitted to the hospital and diagnosed with failure to thrive. *See id.* at *4–5. Upon DFPS's conclusion that H.B. had been physically neglected, the children remained in a voluntary family placement for about nine months before DFPS returned them to Father's care on June 10, 2008. *See id.* at *4, 7, 9. On July 8, 2008, the children were removed from Father after a Volunteers of America (VOA) case worker discovered that A.B. had bruises on his face and left ear. *See id.* at *11. Child Protective Services (CPS) placed the children with a foster family, and DFPS filed its petition to terminate Father's and Mother's parental rights the next day. *See id.* at *13.

In June 2009, after a bench trial, the trial court found by clear and convincing evidence that Father had knowingly placed or knowingly allowed the children to remain in conditions or surroundings that had endangered their physical or emotional well-being, that he had engaged in conduct or knowingly placed the children with persons who had engaged in conduct that endangered

2

the children's physical or emotional well-being, and that termination of Father's parental rights was in the children's best interest.[2]  *See id.* at *32.

Father appealed, challenging the legal and factual sufficiency of the evidence supporting the trial court's findings.  *See id.* at *1.  In July 2010, we overruled Father's legal sufficiency challenges but sustained his challenge to the factual sufficiency of the evidence supporting the endangerment findings.  We held the evidence legally sufficient to support the trial court's best interest finding, and we reversed the trial court's judgment and remanded the case for a new trial. *See id.* at *36, 40–42, 44.

After a jury trial, Father's parental rights were terminated for a second time. The jury made the same endangerment and best interest findings that the trial court had made in the first trial.  *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E), (2) (West Supp. 2012).  Father then raised five points on appeal, and we initially concluded that the evidence supporting the endangerment findings was again insufficient.  However, upon review of DFPS's and the Intervenors' motions for en banc reconsideration, we revise this conclusion and affirm the termination of Father's parental rights.

## II.  Termination of Parental Rights

In his first three points, Father argues that the evidence is legally and factually insufficient to support the endangerment or best interest findings.  *See*

---

[2]Mother's parental rights were also terminated, but she did not appeal.

*id.* In his fourth point, Father complains that the trial court erred by allowing the children's foster parents to intervene, and in his fifth point, he complains that the trial court erred by preventing his impeachment of a DFPS witness.

## A. Sufficiency

### 1. Standards of Review

In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except the child's right to inherit. *Id.* § 161.206(b) (West 2008); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *In re E.R.*, 385 S.W.3d 552, 563 (Tex. 2012) (citing *Holick*, 685 S.W.2d at 20).

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. §§ 161.001, 161.206(a). Due process demands this heightened standard because "[a] parental rights termination proceeding encumbers a value 'far more precious than any property right.'" *E.R.*, 385 S.W.3d at 555 (quoting *Santosky v. Kramer*, 455 U.S. 745, 747–48, 102 S. Ct. 1388, 1391–92 (1982)); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and conservatorship). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (West 2008).

4

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subsection (1) of the statute and must also prove that termination is in the best interest of the child. *Id.* § 161.001; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re D.T.*, 34 S.W.3d 625, 629 (Tex. App.—Fort Worth 2000, pet. denied) (op. on reh'g).

In evaluating the evidence for legal sufficiency in parental termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the challenged ground for termination was proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the finding and judgment. *Id.* We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *Id.*

We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the factfinder's province. *Id.* at 573, 574. And even when credibility issues appear in the appellate record, we defer

5

to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the verdict with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent violated subsection (D) or (E) of section 161.001(1) and that the termination of the parent-child relationship would be in the best interest of the child. Tex. Fam. Code Ann. § 161.001(1)(D), (E), (2); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

### 2. The "Law of the Case" Doctrine Does Not Apply Here

Relying on the "law of the case" doctrine, Father argues that the evidence is legally and factually insufficient to terminate his parental rights under subsections (D) or (E). Specifically, Father identifies four allegations made by DFPS and argues that our holdings on these allegations in his first appeal control the outcome of this appeal because the evidence presented in the second trial was substantially the same as the evidence presented at the first trial. First, he argues that evidence that he slapped A.B. in July 2008 is insufficient under

6

subsection (E) because it was a single incident. Second, he argues that DFPS failed to prove that he knew that H.B. was failing to thrive in the two months before her diagnosis in September 2008 as required under subsection (D). Third, Father argues that there is no evidence that the children witnessed or were harmed by witnessing the alleged violence between Father and Mother. Finally, Father argues that the evidence of his unsanitary living conditions is insufficient to prove that he endangered the children under either subsection (D) or (E).

Although the "law of the case" doctrine generally applies to successive appeals in the same case, it only applies to questions of law, not questions of fact. *See In re B.G.D.*, 351 S.W.3d 131, 141 (Tex. App.—Fort Worth 2011, no pet.) (citing *Hudson v. Wakefield*, 711 S.W.2d 628, 630 (Tex. 1986)). Further, "the decision to revisit a previous holding is left to the discretion of the court under the particular circumstances of each case." *Id.* (citing *City of Houston v. Jackson*, 192 S.W.3d 764, 769 (Tex. 2006)). Because the resolution of Father's first three issues turns on questions of fact, the doctrine does not apply here, and we will analyze the sufficiency of the evidence presented to the jury at the second trial.

### 3. Evidence

At fifteen months old, H.B. was diagnosed with failure to thrive after she suffered a seizure in September 2007 and was admitted into the intensive care unit of Cook Children's Hospital. Her seizure was attributed to hyponatremia, which is inadequate sodium in the blood and can be caused by diluted formula or

7

nutrition-less liquids. During her nine- to ten-day hospital stay, hospital records reflected that H.B. had "significant developmental delays" and that she was not crawling, walking, or sitting up. An earlier medical examination report from May 3, 2007, reflected concern about H.B.'s "head and cranium" development.

With regard to H.B.'s failure to thrive diagnosis, Father testified that he and Mother had agreed that she would tend to the children's doctor visits when they moved to Texas from Missouri[3] and that he did not attend any of the children's doctor visits in Texas. Father testified that he would stay home with one child while Mother took the other child to the doctor. Despite stating that he attended A.B.'s doctor visits with Mother in Missouri, Father offered no explanation as to why he did not continue to do so once the family moved to Texas. And despite Father's failure to involve himself in the children's health care, Father admitted that he was responsible for the children's well-being because he was their parent.[4]

Father did not know who the children's Texas pediatrician was, and the record contains no evidence that Father inquired into the results of the children's doctor visits; rather, Father claimed that Mother did not share with him any

---

[3]A.B. was born while Father and Mother lived in Missouri. Shortly after A.B. was born, the family moved to Texas, where H.B. was born.

[4]Indeed, a parent of a child has a "duty of care, control, [and] protection . . . of the child." Tex. Fam. Code Ann. § 151.001(a)(2) (West 2008). A parent also has "the duty to support the child, including providing the child with clothing, food, shelter, medical and dental care, and education." *Id.* § 151.001(a)(3) (West 2008).

information she received from the children's doctors and that he was "technically . . . not responsible" for his children's health problems if he was not informed of the problems by a doctor. CPS investigator Jennifer Porter testified that when she informed Father on October 10, 2007, that H.B. was extremely developmentally delayed, he blamed Mother, saying that she handled H.B.'s doctor visits.

Regarding H.B.'s development during the spring of 2007, Father said he knew that she was small but "thought she was normal," and he testified that she was eating well and "doing everything that she was supposed to be doing." However, Father later testified that he did not know what developmental goals and milestones were appropriate for H.B. at the time of her seizure. Father also testified that he had been small but not malnourished as a child and that he had suffered seizures as a child.

Father also claimed that he was not responsible for underfeeding H.B. during the two months leading up to her seizure and her failure to thrive diagnosis because he saw the children infrequently. Father and Mother separated in July 2007, and Mother took the children with her when she moved from the family's apartment. The record contains conflicting evidence as to the frequency with which Father cared for the children between his separation from Mother in July 2007 and H.B.'s seizure on September 29, 2007. Although Father testified that his visits with the children were inconsistent, he also admitted that he saw the children "a few times a week." He further testified that he did not see

9

anything unusual with respect to H.B.'s health, that "[s]he ate normal table scraps, she was eating pizza, you know, whatever scraps," and that he was trying to wean her off the bottle by feeding her the same food that he ate. Dr. Peter Lazarus, the Cook Children's pediatrician who saw H.B. in September 2007, testified that Mother had reported that Father sometimes watched the children for her and that "he g[ot] them some weekends, but not consistent[ly]." However, Lamorra Cornelius, who was Father's CPS caseworker from October 2007 through July 2008, testified that Father told her that he watched the children on a daily basis, and Porter testified that Father told her on October 1, 2007, that he watched the children five days a week from 3:00 p.m. until midnight. Janice Barker, a VOA employee who taught Father parenting and homemaking skills from January 2008 to March 2008, also testified that Father told her that he cared for the children every day during his separation from Mother.

The evidence showed that H.B.'s growth problems started well before Father and Mother separated. Dr. Lazarus testified that H.B. was "severely malnourished" on September 29, 2007, and that her condition was of a kind that develops over a period of months. Nurse Donna Wright, a pediatric nurse practitioner with Cook Children's Hospital, testified that H.B. went from the twenty-fifth percentile in weight at birth[5] on June 25, 2006, to her peak at the fiftieth percentile in weight on February 20, 2007. Her weight then fell to the third

---

[5]The twenty-fifth percentile is a healthy weight.

10

percentile on April 9, 2007, and then to below the growth chart on May 3, 2007—actually losing weight from her April exam.[6]  Mother and Father were living together at this point.  There is also evidence in the record that H.B. gained approximately one pound from May 3, 2007, to September 29, 2007.  Father and Mother separated in July 2007.

The record also contains uncontested evidence that H.B. was physically and emotionally endangered by her malnourished state.  Wright testified that H.B. suffered a seizure in September 2007, had language delays that could endanger her physical and emotional well-being, and had gross motor skill developmental delays.  The record further contains hospital reports from H.B.'s September 30, 2007 hospital stay that state that H.B. had "significant developmental delays" and was not crawling, walking, or sitting up.  Porter testified that H.B. was extremely developmentally delayed on October 9, 2007.

With regard to H.B.'s head and cranium development noted in the May 3, 2007 medical examination report, Wright testified that the degree of malnutrition required to slow a child's cranium growth can permanently affect the child's physical and emotional well-being.  Dr. Lazarus stated that problems with brain growth can lead to mental retardation.  Wright testified further that at the time of H.B.'s evaluation in July 2008, H.B. had language delays that "would have a

---

[6]Wright explained that the chart in question was published by the Centers for Disease Control and was designed to determine whether a child is physically developing at a normal rate.

11

potentially endangering effect on [her] physical or emotional wellbeing" because children with language delays "[tend] to have behavioral problems when not understood that can lead to inappropriate temper tantrums and . . . behaviors."

In line with H.B.'s failure to thrive based on malnutrition, Cornelius and Barker testified that Father consistently had either little or no food in his apartment.

Father moved into an apartment in January 2008. Cornelius testified that when she visited this apartment on April 2, 2008, it was clean, but Father had no appropriate food for the children in the home. She advised him to get some. The children were brought to Father's apartment the next day for a four-hour visit, but Father had obtained no food for them. When Cornelius offered to take Father to the store to buy some food, he declined. Cornelius returned to Father's apartment after the visit and found the children hungry and dirty from being at the park; Father then asked her to feed the children.

Cornelius testified that Father returned the children hungry after the next four-hour visit on April 9, 2008, and that he became angry with her when she explained that his failure to feed the children concerned her because of H.B.'s prior failure to thrive diagnosis. Cornelius testified that Father "yell[ed]" and "scream[ed]" at her when she questioned him about the lack of food that he had for the children. She said that Father claimed he was having difficulty obtaining food because the family members with whom the children had been placed had the food stamps and that he was having trouble getting the food stamps

12

transferred back to him. Father had food when the children were brought to his apartment for the next visit on April 21, 2008, and he told Cornelius that a friend gave it to him.

Father returned the children dirty and tired after the next two visits—an overnight visit on May 13, 2008, and a three-day visit in June 2008. Cornelius noted that the children had visible dirt on their bodies and clothing after both visits. She also said that it did not appear that Father had bathed the children at all during the three-day visit in June 2008.

Cornelius testified that although Father took parenting classes as part of the services offered by DFPS, he showed no progress and that he had exposed the children to emotional abuse through the aggressive behavior that he displayed in front of them. Further, she was concerned about returning the children to Father because he had previously neglected their physical needs and was unable to properly care for them during short visits at his apartment. Despite her concerns, however, the children were placed back with Father on June 10, 2008. When she visited Father that day, Father said that he had no food for the children, but Cornelius found that he did. She said that Father was not sure the food was appropriate; Cornelius said that it was.

Cornelius recalled that when she visited Father and the children on June 17, 2008, there was a rotten odor in the air and stains, trash, and "[f]ood, just kind of old food," on the floor but nothing to eat in the home. When she opened the bedroom door, she found the children lying in bed. They did not respond to

13

her, which she testified was unusual, and they were lethargic, covered in visible dirt, and wearing dirty diapers that appeared to have been dirty for some time. Cornelius testified that she left food for the children that day.

When Cornelius visited again on June 27, 2008, conditions had worsened. There was more food on the floor, unclean dishes in the sink, and a stronger rotten odor, but there was some edible food in the home in the form of dry Cheerios. She stated that the apartment "smelled bad, smelled rotten, smelled really dirty[,] and it had not been cleaned."

Barker testified that when she visited Father's apartment on July 1, 2008, the only food she saw in the apartment was a package of ramen noodles. She testified that she encouraged Father to contact a local food bank before the July 4th holiday because she feared that he would not be able to obtain food over the holiday. She said that when she returned to Father's apartment on July 8, 2008, she again found only ramen noodles in his apartment. She also said that the children ate the food that she brought that day.

The next time that Cornelius saw the children was when they were taken to the hospital on July 8, 2008, due to A.B.'s injuries (discussed below). She testified that the children were lethargic until they were fed at the hospital and that she believed that Father had placed the children in a dangerous environment.

14

Jessica,[7] the children's first foster parent, testified that the children hoarded food and over-ate when they first arrived at her house on July 8, 2008.[8] She recalled that the children had seen some television commercials for International House of Pancakes (IHOP) and that she had promised to take them there for breakfast on Saturday if they behaved well. As promised, she and her husband took the children to a nearby IHOP that Saturday. Upon arrival, they determined that the wait would be too long, and she and her husband decided to go to another IHOP "around the corner." She stated that as soon as A.B. sensed that they were leaving without eating, he became hysterical. Jessica testified that he "kept crying and crying and begging to eat." She stated that he even tried to force his body through the side windows of the family van despite the fact that the windows would open only a few inches. She said that when they arrived at the second IHOP, A.B. was "emotionally spent" and "drenched in sweat." Jessica recalled that A.B. ate his meal and hers as well and that he was "obviously very embarrassed by his behavior."

After the CPS case had been opened because of H.B.'s failure to thrive, A.B. suffered an injury serious enough to require a trip to the hospital. Barker

---

[7]We use pseudonyms for the names of any caregivers and family members to protect the children's identities. *See* Tex. R. App. P. 9.8 & cmt.

[8]About seven months after the children were placed with Jessica, she decided to let CPS move them to another foster home because Father had made allegations that she and her husband had abused A.B. Jessica testified she was in the process of adopting another child and feared that continuing allegations might jeopardize the adoption.

testified that she visited Father and the children on July 8, 2008, discovered that A.B. had been injured, and contacted CPS, who transported the children to Cook Children's Hospital. The record reflects that at some time between Barker's visit on July 1, 2008, and her visit on July 8, 2008, A.B. suffered linear bruises on his left cheek, a bruise on his left eyelid, and a large bruise on his left ear. Wright and Dr. Carl Shaw, a physician at the Cook Children's Hospital emergency room, testified that A.B. also had some bruises on his chin, a bruise on his right buttock, and a bruise on his lower left abdomen.

Wright and Dr. Shaw also testified that A.B.'s injuries were not of a kind that a child would sustain accidentally. Wright concluded that the injury to A.B.'s ear was more consistent with a pinch or "blow" to his ear and that the linear bruises on A.B.'s face appeared to have been caused by an open-hand slap. Dr. Shaw testified that the injuries to A.B.'s face and ear were likely caused by physical abuse and stated, "I have never seen such a set of injuries from an accident[,] and I don't expect to." Although Father testified that he did not hit A.B., he pleaded guilty to a charge of injury to a child.[9]

Father gave three different accounts of the cause of A.B.'s injury. Father testified that Janice Barker arrived at his apartment on July 8, 2008, at 11:00 a.m. and that neither he nor the children were awake when she arrived. He

[9]Father received and successfully completed deferred adjudication community supervision on the charge. He testified that he had pleaded guilty so that he would be able to get out of jail and work on the CPS service plan.

16

stated that Barker came in and, once everyone was in the living room, he opened the blinds and noticed the bruises on A.B.'s face and ear. Barker then asked A.B. what had happened, and A.B. said that he fell. Father said that he explained to Barker that A.B. awoke in the middle of the night and began "slapping" his ear on his bed, saying, "[M]y ear, my ear, my ear." Father said that he assumed that A.B. had "[run] into the toddler bed, or had been jumping on his bed and fell into [sic] the toddler bed." However, Barker testified that after A.B. said he had fallen, she asked Father what had happened and Father "was quiet at first, and then he said, ['I]t's no big deal, he fell. You heard him say he fell.[']" Barker also testified, "In my opinion it was obvious that this child ha[d] been struck, and [Father] was the only person in the apartment that I knew had been with the children."

CPS case aide Val Trammell testified that Father had given her two different accounts of how A.B. was injured. According to Trammell, Father showed her a photograph that he had taken of the security gate at his apartment complex and told her that A.B. had tripped over the gate. On another occasion, Father stated that A.B. had tripped over a stroller.

Both of the children's foster families testified about A.B.'s nightmares and A.B.'s claims that Father injured his ear. Jessica testified that A.B. said, "[M]y daddy tried to rip my ear off." She said that A.B. had nightmares in which he would cry out, "[N]o, daddy, no." Gene, the children's second foster parent, also testified that A.B. suffered nightmares in which he would awaken in the middle of

17

the night yelling "no" and "cupping his hand over his left ear saying, [']owee.[']" Gene also recalled that when A.B. first arrived, he told Gene that "daddy tried to pull [his] ear off."

In addition to the facts set out above, the record reflects that Father had frequent confrontations with CPS workers and others in front of the children.

CPS investigator Bryan Knox, who began working with Father when CPS determined that Father's relationship with Cornelius had become too contentious, testified that Father was "[a]ngry, angry, angry" when CPS had the children transported to the hospital on July 8, 2008, because of A.B.'s injuries. He testified further that, while at the hospital, Father said, "[S]uck my dick," to a police officer in front of the children. Father admitted that he was "[h]ighly upset" because CPS was investigating him again and that he did not act maturely, but that he was "not totally belligerent." He claimed that he was acting as a "normal upset parent."

Barker testified that VOA changed its procedures and started locking its doors in response to Father's outburst at the VOA offices in early 2008. She stated further that she feared that Father might have harmed himself or the children if he had realized that she might report A.B.'s injuries to CPS.

Trammell transported the children from their foster home to CPS offices for Father's visits and witnessed the visits. She testified that Father "[was] an angry young man" who displayed a lot of anger toward the CPS workers in front of the children at "virtually every visit" from October 2008 to June 2009. She also

18

testified that CPS workers had to occasionally call a security guard to redirect Father so that he would interact with the children.

Further, Trammell said that when the children witnessed these confrontations, they would move away and "try[] to make themselves invisible" to get away from Father. She stated further that the children initially did not want to leave their foster home to visit Father and that they would cry and run away to avoid getting in the car.

Father claimed that the arguments happened only "once or twice" and never in front of the children. Father testified that when he visited the children, he would play with them, feed them, change their diapers, and read to them. He said that the children were happy and on one occasion "[A.B.] or [H.B.] ran up to [him] and grabbed [his] leg and said, ['D]addy, daddy,['] and was all happy about it." Father also testified that he attended all of the scheduled visits.

Constance Burdick, a clinical social worker with Catholic Charities, testified that Father started sessions with her on January 6, 2009, for anger management classes and individual counseling. She stated that Father refused to recognize that he had anger issues and that any discussion of improving his communication skills only served to "agitate him and make him angry." Burdick stated further that Father "never displayed appropriate anger management skills or the ability to change his behavior."

Father also testified that although he gets "agitated occasionally," he thinks that is normal. He then admitted, however, that he behaved inappropriately with

19

the CPS workers. He also admitted that he called one CPS caseworker a "bitch" and another who came to his apartment a "whore," and he admitted that he said, "[S]uck my dick," to the police officer at the hospital on July 8, 2008. However, he stated that he felt his behavior was necessary because DFPS was not willing to listen to him otherwise.

Burdick concluded that Father was "low functioning in insight and impulse control," which could endanger the children's physical or emotional well-being because he would struggle to cope with an ill child or a child with developmental problems. The record reflects that both children are developmentally delayed.[10] Dr. Parnell Edward Ryan, a licensed psychologist and professional counselor who performed two psychological evaluations and one diagnostic consultation on Father, also diagnosed Father with lack of insight and stated that Father consistently believed that he did not need to change. Dr. Ryan also diagnosed Father with bi-polar disorder but noted in his January 2011 evaluation that Father did not present a danger to the children.

### 4. Endangerment under Section 161.001(1)(E)

"Endanger" means to expose to loss or injury, to jeopardize. *Boyd*, 727 S.W.2d at 533; *In re J.T.G.,* 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.); *see also In re M.C.,* 917 S.W.2d 268, 269 (Tex. 1996). It requires more

---

[10]In addition to H.B.'s developmental delays discussed previously, the record indicates that A.B. is considered "special needs" because of his language delays.

20

than a mere threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment. *Boyd*, 727 S.W.2d at 533.

Under subsection (E), DFPS had to prove that Father engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the physical or emotional well-being of the children. *See* Tex. Fam. Code Ann. § 161.001(1)(E). Scienter is only required under subsection (E) when a parent places a child with others who engage in a course of conduct that endangers the child. *See In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied). The relevant inquiry is whether evidence exists that the endangerment of the children's physical or emotional well-being was the direct result of Father's conduct, including acts, omissions, or failures to act. *In re M.C.T.*, 250 S.W.3d 161, 169 (Tex. App.—Fort Worth 2008, no pet.); *see* Tex. Fam. Code Ann. § 161.001(1)(E). Termination under subsection (E) must be based on more than a single act or omission; the statute requires that Father engage in a voluntary, deliberate, and conscious course of conduct. *M.C.T.*, 250 S.W.3d at 169; *see* Tex. Fam. Code Ann. § 161.001(1)(E).

It is not necessary, however, that Father's conduct be directed at the children or that the children actually suffer injury, and the specific danger to the children's well-being may be inferred from Father's misconduct standing alone. *Boyd*, 727 S.W.2d at 533; *M.C.T.*, 250 S.W.3d at 168–69; *R.W.*, 129 S.W.3d at 738. Additionally, a parent's conduct that "'subjects a child to a life of uncertainty and instability'" endangers the child's physical and emotional well-being. *In re*

21

*A.W.*, No. 02-11-00345-CV, 2012 WL 955385, at *9 (Tex. App.—Fort Worth Mar. 22, 2012, no pet.) (mem. op.) (quoting *R.W.*, 129 S.W.3d at 739). And "[n]eglect can be just as dangerous to a child's emotional and physical health as intentional abuse." *In re E.A.W.S.*, No. 02-06-00031-CV, 2006 WL 3525367, at *10 (Tex. App.—Fort Worth Dec. 7, 2006, pet. denied) (mem. op.). Finally, "a parent's mental state may be considered in determining whether a child is endangered if that mental state allows the parent to engage in conduct that jeopardizes the physical or emotional well-being of the child." *In re M.E.-M.N.*, 342 S.W.3d 254, 262 (Tex. App.—Fort Worth 2011, pet. denied).

The Intervenors point out in their motion for en banc reconsideration that two weeks before our September 13, 2012 opinion issued in this case, this court upheld the termination of parental rights in *In re E.P.C.*, 381 S.W.3d 670 (Tex. App.—Fort Worth 2012, no pet.), on very similar facts to those the jury considered in making its endangerment findings in this case.

In *E.P.C.*, the parents left a ten and one-half month old child alone in an apartment. *Id.* at 674. A maintenance man found her and contacted the apartment manager, who called the child's father and the police. *Id.* The police contacted DFPS, and the DFPS investigator became concerned about the baby's small size for her age. *Id.* at 674–75. The child had no bruises or visible battering, but her bones were visible, and the child was developmentally delayed in that she could not roll over, crawl, or push up, despite her age; during the two hours she spent at the DFPS office, the child devoured two eight-ounce bottles of

22

formula "as if she had not eaten in a long period of time." *Id.* at 675. DFPS removed the child that night. *Id.* The child was taken to Cook Children's Hospital the next day, where it was determined that the child's growth and weight were "on the downward trend" for her age, but not off the charts. *Id.* Eight days after E.P.C.'s removal, when the DFPS investigator visited the parents' home, she saw fourteen cans of baby formula but no baby food, which concerned her because of the child's age, developmental level, and size. *Id.*

E.P.C. was diagnosed with failure to thrive; she gained four pounds in her first two months of foster care. *Id.* at 677. Her weight at birth had been seven pounds, four ounces, and at her three-month checkup, she weighed twelve pounds, two ounces. *Id.* At her six-month checkup and her nine-month checkup, she weighed fifteen pounds. *Id.* Three weeks after her removal, she weighed seventeen pounds, and by her eighteen-month checkup, she weighed twenty-five pounds. *Id.*

We upheld the trial court's termination of the father's parental rights based on endangerment under subsection (E), because, as one of her primary caregivers, the father should have noticed her failure to thrive. *Id.* at 684; *see also In re T.T.F.*, 331 S.W.3d 461, 484 (Tex. App.—Fort Worth 2010, no pet.) (discussing child's failure to thrive diagnosis and holding sufficient evidence supported endangerment finding under subsection (E)). Specifically, in *E.P.C.*, we stated that the child had been exposed to a course of conduct while living with the father that involved the failure to provide her with proper nutrition.

23

*E.P.C.*, 381 S.W.3d at 684. The main difference between this case and *E.P.C.* is that in *E.P.C.* we also relied on the father's having left the child alone on up to eight occasions and his lack of remorse for having done so. *Id.*; *see also In re E.L.R.*, No. 02-05-00329-CV, 2007 WL 1018662, at *4–5, 9 (Tex. App.—Fort Worth Apr. 5, 2007, no pet.) (mem. op.) (noting children's language delays and behavioral problems as evidence of endangerment under subsection (E)).

As the "'sole arbiter when assessing the credibility and demeanor of witnesses,'" the jury in this case was free to disregard Father's testimony and Mother's report to the hospital about the frequency with which Father cared for the children. *See H.R.M.*, 209 S.W.3d at 109 (quoting *In re J.L.*, 163 S.W.3d 79, 86–87 (Tex. 2005)). Thus, the jury could have reasonably concluded that H.B.'s "severely malnourished" state, which resulted in a failure to thrive diagnosis on September 29, 2007, was due to Father's conscious disregard for his parental duty to provide for H.B.'s medical care both before and after he and Mother separated, much like the father in *E.P.C. See id.*; *see also E.P.C.*, 381 S.W.3d at 684. Based on the same resolution that we reached in *E.P.C.* with regard to H.B.'s failure to thrive, we conclude that the evidence is legally sufficient to support the endangerment finding as to both children under section 161.001(E). *See E.P.C.*, 381 S.W.3d at 684; *see also D.T.*, 34 S.W.3d at 637 (stating that evidence of how a parent has treated another child is relevant regarding whether a course of conduct under subsection (E) has been established).

24

Further, the jury could have reasonably concluded that Father engaged in a conscious course of conduct by consistently failing to adequately feed his children and that he voluntarily engaged in a course of hostile conduct around the children, CPS caseworkers, and other authorities that culminated with A.B.'s injuries (for which he pleaded guilty to criminal charges), further endangering the children's physical and emotional well-being. *See Boyd*, 727 S.W.2d at 533; *M.C.T.*, 250 S.W.3d at 169. Therefore, based on the foregoing and giving due deference to the jury's determinations of credibility and the weight of the evidence, we conclude that the evidence is also factually sufficient to support the endangerment finding under section 161.001(1)(E). *See* Tex. Fam. Code Ann. § 161.001(1)(E); *H.R.M.*, 209 S.W.3d at 108; *J.P.B.*, 180 S.W.3d at 573. We overrule Father's second point.[11]

---

[11]Finding one ground under section 161.001(1) along with the best interest finding is sufficient to support a judgment of termination. *J.L.*, 163 S.W.3d at 84. Thus, we need not address the remainder of Father's first point. *See* Tex. R. App. P. 47.1.

## 5. Best Interest

In his third point, Father challenges the legal and factual sufficiency of the evidence to support the jury's finding that it was in his children's best interest to terminate his parental rights.

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (West 2008). The following factors should be considered in evaluating the parent's willingness and ability to provide the child with a safe environment:

(1)  the child's age and physical and mental vulnerabilities;

(2)  the magnitude, frequency, and circumstances of the harm to the child;

(3)  whether the child has been the victim of repeated harm after the initial report and intervention by the department or other agency;

(4)  whether the child is fearful of living in or returning to the child's home;

(5)  the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home;

(6)  whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home;

(7)  whether the perpetrator of the harm to the child is identified;

26

(8)     the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision;

(9)     the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time;

(10)    whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with:

  (A)    minimally adequate health and nutritional care;

  (B)    care, nurturance, and appropriate discipline consistent with the child's physical and psychological development;

  (C)    guidance and supervision consistent with the child's safety;

  (D)    a safe physical home environment;

  (E)    protection from repeated exposure to violence even though the violence may not be directed at the child; and

  (F)    an understanding of the child's needs and capabilities; and

(11)    whether an adequate social support system consisting of an extended family and friends is available to the child.

*Id.* § 263.307(b); *R.R.,* 209 S.W.3d at 116.

Other, nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include the emotional and physical needs of the child now and in the future; the emotional and physical danger to the child now and in the future; the parental abilities of the individuals seeking custody; the stability of the home or proposed placement; and any

excuse for the acts or omissions of the parent.  *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted).  These factors are not exhaustive; some listed factors may be inapplicable to some cases.  *C.H.*, 89 S.W.3d at 27.  Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child.  *Id.*  On the other hand, the presence of scant evidence relevant to each factor will not support such a finding.  *Id.*

### a.  Father's Service Plans

Cornelius testified that she established services for Father after visiting his apartment in October 2007.  She said that she set up in-home parenting classes, which included nutritional classes offered through VOA, individual counseling sessions, and a psychological exam.  She stated further that Father was required to maintain a suitable home for the children as part of the service plan.  Cornelius testified that Father completed the parenting classes and the psychological exam but that he failed to complete the individual counseling sessions.  Father testified that he discontinued the individual counseling sessions because the counselor "was basically taking CPS's side."

Barker, who taught Father's in-home parenting classes, testified that although he passed his parenting test, Father exhibited an inability to maintain a suitable home for the children. She testified that Father's living conditions quickly deteriorated from January 2008 to March 2008 and that she was concerned about Father's ability to correct the problems after the classes ended in March

2008. Cornelius also testified that although Father took parenting classes as part of the services offered by CPS, he showed no progress.

Cornelius testified that she set up anger management classes for Father in June 2008 after CPS had decided to return the children to him and that he completed the classes.

Burdick testified that Father came to her for anger management classes, starting on January 6, 2009. She said that Father attended all of the anger management classes and received a certificate of completion but that he "never displayed appropriate anger management skills or the ability to change his behavior." Burdick said that Father "was intrusive in group [sessions and] . . . demanded time to speak . . . ." Burdick stated further that Father's focus "from the very first group was to get me to write a letter stating that he did not have an anger issue and did not need to attend the group."

Burdick testified that she also conducted individual counseling sessions with Father from February 24, 2009, to April 22, 2009. She stated that Father requested a new therapist from her supervisors because he thought that she "did not like him" and was "out to get him." When he did not receive a new therapist, he discontinued the individual sessions. Burdick also recalled that although Father had taken a domestic abuse project assessment and was accepted into a batterer's intervention program, Father denied that he had physically abused Mother.

### b. Father's Inability to Care for His Children

The record reflects that the children exhibited developmental delays, especially A.B., a "special needs" child. Additionally, the evidence discussed above casts doubt on Father's ability to understand his children's needs and to provide them with minimally adequate healthcare and nutrition.

### c. Father's Inability to Provide a Safe Home

Further, the record reflects that Father was unable to provide a safe physical home environment. Testimony from Cornelius, Porter, and Barker showed Father's inability to maintain safe living conditions in three different apartments from October 2007 to July 2008. The record also reflects that unsafe living conditions in Father's home persisted through February 2011.

Porter testified that on October 10, 2007, Father's apartment had a strong odor of animal feces and animal urine, stains and animal excrement were on the floor, the walls were ripped up, and bugs were visible in the home, including in the refrigerator and the freezer. She testified that the apartment could be a dangerous environment for young children who crawl on the floor and put things in their mouths. Cornelius also testified that when she visited Father's apartment in October 2007, she felt fleas biting her legs and she noticed a strong odor, stains on the carpet, roaches in the kitchen, and black water and dirty dishes in the dishwasher.

Barker testified that when she visited Father in January 2008, he had moved to a new apartment, which was clean. However, Father's living conditions

deteriorated from January 2008 to March 2008, and given the speed with which Father's living conditions deteriorated, Barker expressed concern that Father would not be able to appropriately maintain his home if the children were returned.

Cornelius testified that Father told her that he was being evicted from his apartment and that he moved into a new apartment at the end of May 2008. She recalled that when she visited Father and the children on June 17, 2008, there was a rotten odor in the air and stains, trash, and "[f]ood, just kind of old food," on the floor.

Additionally, Melissa Reagan Perez, Father's community supervision officer, testified that from July 2009 to October 2009, Father's apartment was "generally cluttered" and "very unclean," with fast food wrappers and containers left out. Perez thought that Father's apartment was not an appropriate place for children to live "primarily because there [was] a very strong odor from the litter box." She also testified that she detected a "very heavy odor that appeared to be a dirty litter box and . . . human body odor" while standing outside of Father's apartment as he talked with her from the doorway when she visited his apartment in February 2011.

Sheryl Coaxum, assistant manager of the Cherry Hill Apartments, testified that Father had lease violations in September and October 2010 for unsanitary living conditions that had been reported by the pest control company. She testified that Father had requested a pest control treatment but that on

September 28, 2010, the pest control company personnel told Father that they would not treat his apartment until he cleaned it, especially the area behind the microwave where workers found dead roaches. She testified further that pest control could not treat Father's apartment on October 5, 2010, because Father had not complied with instructions to clean it.[12] When the pest control technician visited Father's apartment on October 19, 2010, he wrote "Bad!!" on his report. Coaxum also testified that maintenance employees refused to fix Father's dishwasher in September 2010 until he cleaned the dirty floors. However, she also testified that she had no record of a complaint or a lease violation for unsanitary living conditions during June and July 2008 while his children were living with him. In contrast, Knox testified that Father's apartments were just messy. And Barker testified that Father's apartments were clean when she visited in January and July of 2008.

### d. Father's Inability to Cooperate with Supervision

Burdick testified that she conducted individual counseling sessions with Father while he was attending anger management classes and that the goal of the sessions was to teach Father to "communicate effectively, manage stress appropriately, and [use] negotiations to accomplish goals in life." She testified that Father ended their relationship after eight sessions because she refused to

---

[12]Coaxum testified that the exterminator refused to treat Father's apartment until he removed the dead roaches because the pest treatment would have no effect as roaches would continue to enter the apartment to feed off of the dead roaches after the treatment.

write letters stating that he did not injure his child and did not need anger management or individual counseling.

Burdick also testified about Father's paranoia. She testified that she and Father had weekly discussions about his fear that DFPS, the courts, the attorneys, the police, and the doctors at Cook Children's Hospital were out to get him. Burdick also testified that Father eventually added her to the list of people who were out to get him. Burdick stated that all parents should have a degree of "watchfulness," but the feeling that "someone is following, watching, monitoring my behavior, as a parent is not a healthy way of living."

As discussed above, the record reflects that Father responded angrily when questioned about his failure to feed the children during a visit and rejected Cornelius's offer to take him to the store to buy food for the children. Further, Father's angry outburst at the VOA office prompted the organization to implement security measures out of concern for the safety of its employees. Trammell also testified that Father spent time at the beginning of every visit with the children at CPS offices by yelling and venting at the CPS workers and stated that CPS workers had to call a security guard to redirect him at times.

Father stated that all of DFPS's witnesses had been untruthful "because they all work for the prosecutor, who wants to terminate [his] rights." Specifically, Father testified that Burdick was untruthful because of her contact with Groomer—another CPS caseworker with whom Father had a contentious relationship—and claimed that Coaxum, Barker, and Cornelius were untruthful

33

except with respect to the parts of their testimony that favored him. Father also claimed that the pest control technician and the maintenance person who refused to work inside of his apartment were lying, but he stated that "the doctors were most likely telling the truth; they are not going to risk their medical license to lie."

### e. Father's Relationship with an Abusive Person

Sylvia, Father's paramour who began periodically living with Father in May 2010 and who was pregnant with a child that Father claimed might be his, had a history of assaultive conduct. Father testified that she might live in his home upon the children's return. At the time of the termination trial, Sylvia was on community supervision for injury to the elderly, and she had previously been charged with theft as a juvenile and assault on the elderly. She also had bi-polar disorder, and she had another child but did not have custody of that child.

### f. Father's Unwillingness to Make Personal Changes

Burdick testified that she was concerned about whether Father could properly care for children because he was unable to take care of his own hygiene needs. She stated that, as of April 22, 2009, she did not think Father was capable of caring for himself or his children. According to Burdick, Father was incapable of caring for himself, monitoring his own physical well-being, or managing his finances, and he had no plan to improve.

In Burdick's view, Father's goal was to "exonerate himself from any problems and to get his children back." She said, "[Father's] goal was to get people on his side, and those were his words, [']I need to make sure that

everybody is on my side so I can get my children back. My life will be okay if I get my children back.[']" She said that any discussion of improving his communication skills or his ability to think rationally only served to "agitate him and make him angry." During Burdick's time with him, Father showed no improvement in his ability to care for himself, respond appropriately, or channel his anger.

Dr. Ryan testified that Father was consistent in his belief that he did not need to change. When asked at trial whether Father would likely participate in services offered through DFPS, Dr. Ryan said, "Possibly," because although he is "fond of his children, . . . he says he doesn't need to change anything." Father stated during Dr. Ryan's November 19, 2007 psychological evaluation, "If I could change one thing about myself, it would be to become a computer network administrator." Dr. Ryan also stated in his January 9, 2011 psychological evaluation that Father's profile "suggests someone who overevaluates [sic] his ability to cope with life stressors" and that Father deemed his "problematic issues" a disability with his sole "problematic issue" being his relationship with CPS.

Father testified that he had taken a few classes at Tarrant County College as recently as spring 2010 in pursuit of one of two computer degrees—information security technology or personal computer support. He also testified that his cumulative grade point average in college was a 3.8 and that he planned on returning to classes when this case was resolved.

35

Father admitted that he had lived in the same place for two and a half years but did not know which school his children would attend if they were returned. He also stated that he did not have a toddler bed or a crib for the children but that he could obtain those.

### g. Father's and Foster Parent's Financial Stability

Father stated that he could not remember where he worked last and that he continued to receive supplemental security income (SSI). The record reflects that a psychiatrist stated in a mental illness evaluation given as part of Father's community supervision that Father did not have "signs or symptoms of mental illness." When asked at trial why he continued to receive SSI despite this diagnosis, Father said that the Social Security Administration had not reviewed his disability status since the date of the mental illness evaluation.

Father testified that his income consisted of his social security, food stamps, and the money that he earned from donating plasma. When asked whether he was able to work, Father said that he had a "registered disability" and, "I'm on Social Security disability; that is my job." Father stated further that he did not know why he was unable to work but that the Social Security Administration had ruled that he was unable to do so. He testified that despite his disability, he was able to be a full-time parent to his children.

Father said that he was not financially ready to have the children returned but that if they were returned, his food stamps allotment would increase from $360 to $400, which would be plenty of money. He also claimed that if Sylvia's

36

baby was his, he and Sylvia would receive enough additional food stamps to cover the cost of the additional child.

In contrast, Gene testified that he worked for a large corporation and that he telecommutes to work from a private office at home.[13] He stated further that Jill was a stay-at-home mother with a bachelor's degree in interior design and experience working in daycares and preschools.

### h. Stability of Children's Foster Home

The evidence shows that the children demonstrated physical and mental improvement while they were in foster care, that Gene and Jill provide the children with a safe and nurturing environment, that the children call Gene and Jill "Mommy" and "Daddy," and that Gene and Jill would like to adopt the children if Father's parental rights are terminated.

CPS caseworker Joanna Letz testified that she had been the children's caseworker since August 2010 and that Gene and Jill give the children "a lot of attention." She also testified that Gene and Jill were "very patient" when they interacted with the children and that the children were "very bonded to the foster parents."

Gene said that the self-esteem issues that A.B. exhibited when he first came to Gene's home had improved. Gene testified that A.B. would initially not

---

[13]Gene was reluctant to give his employer's name because Father had previously obtained Gene's contact information and contacted him at home.

defend himself and would often "fall to the ground and cry" if H.B. took a toy away from him but that his opinion of himself has gradually improved.

Elaine Johnson, a licensed professional counselor and children's play therapist who saw the children in March 2009 and evaluated them in play therapy, testified that A.B. would often lash out in anger during the first few weeks after he first arrived at Gene and Jill's house and had on one occasion tried to bite Gene. She testified that it is not unusual for children who have experienced trauma to act out in this way. Consistent with Gene's testimony, Johnson testified that A.B. initially had a low opinion of himself and was distressed by H.B.'s actions, that his "ego strength" had grown, and that now he defends himself more. She also testified that she had been working with Gene and Jill to help the children cope with the stress brought on by the transition to attending school.

Trammell testified that Gene and Jill had a beautiful home. Letz also testified that Gene and Jill's home was clean and orderly and that the children have their own rooms. At trial, Gene and Jill offered photographs depicting the condition of the children's rooms and the living room in their home consistent with Trammell's and Letz's testimony.

Gene testified that Jill volunteers as a home room mother at A.B.'s school and that H.B. was enrolled at a local pre-kindergarten school. He also said that both children played sports and that he and A.B. participated in a YMCA

Adventure Guides program. Gene also testified that he and Jill had involved A.B. in extracurricular activities to work on his language delays.

### i. Application

Viewing the evidence in the light most favorable to the judgment, we hold that the jury could have reasonably formed a firm conviction or belief that termination was in the children's best interest. *See* Tex. Fam. Code Ann. § 263.307(b); *J.P.B.*, 180 S.W.3d at 573; *see also In re A.C.B.*, 198 S.W.3d 294, 298 (Tex. App.—Amarillo 2006, no pet.) (holding that although a parent's performance of a service plan is likely to fulfill some of the *Holley* factors, service plan compliance alone will not prevent termination of a parent's rights); *In re M.G.D.*, 108 S.W.3d 508, 513–15 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (holding that termination of the mother's parental rights was in the children's best interest despite the fact that she completed her service plan). *C.f. In re W.C.*, 98 S.W.3d 753, 765–66 (Tex. App.—Fort Worth 2003, no pet.) (holding that the evidence was factually insufficient to show that termination was in the children's best interest because the mother had not only completed her service plan but had significantly improved her insight and coping skills, family relationships, and support system). Likewise, viewing the entire record in a neutral light, we hold that the evidence is factually sufficient for the jury to form a firm conviction or belief that termination was in the children's best interest. *See H.R.M.*, 209 S.W.3d at 108. We overrule Father's third point.

## B. Intervention

In his fourth point, Father claims that the trial court erred by allowing Gene and Jill to intervene in the termination suit because (1) they should not have been able to gain standing after the trial court wrongfully terminated his parental rights and (2) intervention by foster parents violates a parent's due process rights by disrupting the balance between his rights as a parent and DFPS's power to terminate his parental rights.

### 1. Foster Parents' Standing to Intervene

We review a trial court's denial of a motion to strike for an abuse of discretion. *See In re N.L.G.*, 238 S.W.3d 828, 829 (Tex. App.—Fort Worth 2007, no pet.). A trial court abuses its discretion if it acts without reference to any guiding rules or principles, that is, if the act is arbitrary or unreasonable. *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007); *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004).

The trial court found that Gene and Jill had standing to intervene under section 102.004(b), which permits "other persons" with "substantial past contact" to intervene in a pending suit affecting the parent-child relationship. Tex. Fam. Code Ann. § 102.004(b) (West 2008).

We have held that there is "[s]ound policy support[ing] the relaxed standing requirements" found in section 102.004 because allowing persons with "substantial past contact" to intervene may "enhance the trial court's ability to adjudicate the cause in the best interest of the child." *N.L.G.*, 238 S.W.3d at 830.

40

By the time Gene and Jill filed their petition in intervention, the children had been living with them for almost twenty-two months. Additionally, the children had become emotionally attached to them, and Gene and Jill planned to adopt the children if Father's parental rights were terminated. Thus, Gene and Jill had "substantial past contact" with the children, and the trial court did not abuse its discretion by denying Father's motion to strike.[14] *See id.*

## 2. Due Process

Father argues that the foster parent's intervention violated his due process rights by interjecting the issue of their fitness to parent the children into the suit concerning his fitness to retain his rights to them. Father claims that this caused an imbalance of power between his rights as a parent and DFPS's power to terminate his parental rights. As evidence of this imbalance, Father claims that he had no current pictures of the children to present to the jury because he had not seen the children in a year and a half, while the foster parents were able to publish a "heart-warming" picture album to the jury.

All Texas statutes must comply with both the state and federal constitutions. *See* Tex. Gov't Code Ann. § 311.021(1) (West 2013); *In re Russell*, 321 S.W.3d 846, 857 (Tex. App.—Fort Worth 2010, orig. proceeding).

---

[14]Father argues that our reversal of the first termination order should somehow cancel out all but approximately three months of the time that the children have been with Gene and Jill. However, we decline to invade the province of the legislature by injecting new requirements into the statute. *See Atmos Energy Corp. v. Cities of Allen*, 353 S.W.3d 156, 162 (Tex. 2011).

As discussed above, family code section 102.004(b) allows persons with "substantial past contact" to intervene in a pending suit affecting the parent-child relationship. Tex. Fam. Code Ann. § 102.004(b).

In *Rodarte v. Cox*, the Tyler court determined the constitutionality of former section 11.03(d) of the family code, recodified as section 102.005, which is similar to section 102.004(b) and allowed any adult with substantial past contact with a child standing to bring a suit for parental termination and adoption of the child, *see* 828 S.W.2d 65, 79 (Tex. App.—Tyler 1991, writ denied); *see also* Tex. Fam. Code Ann. § 102.004(b); Act of Apr. 6, 1995, 74th Leg., R.S., ch. 20, § 1, sec. 102.005(4), 1995 Tex. Gen. Laws 125 (amended 2007) (current version at Tex. Fam. Code Ann. § 102.005(5) (West Supp. 2012)); Act of May 22, 1985, 69th Leg., R.S., ch. 802, § 1, sec. 11.03(d), 1985 Tex. Gen. Laws 2842, *repealed by* Act of Apr. 6, 1995, 74th Leg., R.S., ch. 20, § 2, 1995 Tex. Gen. Laws 282. The appellants in *Rodarte* argued that section 11.03(d)(4) was unconstitutional because only the State is permitted to seek termination of a parent's rights. *See* 828 S.W.2d at 79.

The court stated that the Fourteenth Amendment due process guarantee protects parents when conflicts arise between the State's *parens patriae* interest[15] and a parent's rights. *Id.* Citing *Morrissey v. Brewer*, 408 U.S. 471,

---

[15]The State's *parens patriae* interest is the State's interest in preserving and promoting a child's welfare. *See Santosky*, 455 U.S. at 766, 102 S. Ct. at 1401. "As *parens patriae*, the State's goal is to provide the child with a permanent home." *Id.*

481, 92 S. Ct. 2593, 2600 (1972), the court observed, however, that "[d]ue process is flexible and calls for such procedural protections as the particular situation demands," and it set out a three factor test from *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S. Ct. 893, 903 (1976), for assessing due process. *Rodarte*, 828 S.W.2d at 79. The court stated,

> First, the private interest that will be affected by official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* (quoting *Mathews*, 424 U.S. at 335, 96 S. Ct. at 903).

Applying the test, the court noted that regardless of the party suing to terminate a parent's rights, the petitioner was still required to prove by clear and convincing evidence the parents' misconduct and that termination would be in the child's best interest. *Id.* at 79–80. Thus, the court held that the appellants' due process rights were not violated, noting that they were represented by counsel, that a trial was held, and that the Department of Human Services had attempted to help them improve their parenting skills. *Id.* at 80.

Like the appellants in *Rodarte*, Father had appointed counsel and received a jury trial in which DFPS had the burden of proving the grounds for termination by clear and convincing evidence. *See id.* He also received services from DFPS and VOA. Further, Father does not direct us to any evidence offered by the foster parents that DFPS could not have offered had the foster parents not

43

intervened.[16]   Thus, we hold that the trial court did not violate Father's due process rights by allowing Gene and Jill to intervene.   *See id.*   We overrule Father's fourth point.

## C. Impeachment

In his fifth point, Father argues that the trial court erroneously denied him the right to fully cross-examine Burdick by preventing him from impeaching her regarding her bias against him.   Specifically, Father argues that the trial court gave the jury a false impression and violated his right to a full cross-examination by redacting from Burdick's report her comments regarding a polygraph examination that he took while attending counseling with Burdick to prove to her that he did not cause A.B.'s injuries.

Before trial, the Intervenors filed a motion in limine seeking to prohibit the parties from making "[a]ny reference to polygraph results or the taking of a polygraph examination."   Father agreed to the prohibition and the trial court granted the motion.

At trial and outside the presence of the jury, Father asked the trial court to allow evidence of the polygraph to be admitted so that he could cross-examine Burdick on her alleged bias against him.   Specifically, Father wanted to cross-

---

[16]Indeed, the photographs referenced above are the only evidence that Father cites to show that the foster parents' intervention violated his due process rights.  *But see Tex. Dep't of Human Servs. v. White*, 817 S.W.2d 62, 63 (Tex. 1991) (holding that the trial court did not commit reversible error by admitting the State's photograph showing the child with his foster family).

44

examine Burdick on why she refused to consider the polygraph results when she determined whether his parental rights should be terminated. Father noted that Burdick had submitted her conclusions to CPS in a report that allegedly contained her comments regarding his decision to take a polygraph examination. Consistent with the motion in limine, Burdick's comments regarding the polygraph examination were redacted from the report before it was admitted into evidence.

Father claimed that Burdick's bias against him stemmed from the fact that he showed no remorse over A.B.'s injuries. He claimed that he submitted to the polygraph examination to convince Burdick that he had not injured A.B. In order to show Burdick's bias, Father claimed that he needed to cross-examine her on the redacted portion of her report in which Father alleged that she had said that he wasted his money by taking a polygraph examination.[17] DFPS pointed out to the trial court that Father could ask Burdick about her bias without discussing the polygraph examination.

After DFPS examined Burdick, it offered the redacted copy of Burdick's report into evidence. Father objected on the ground that rule of evidence 107 prohibited the introduction of a redacted copy of the report. *See* Tex. R. Evid. 107. The trial court admitted the redacted report over Father's objection; Father

---

[17]Father asked the trial court to allow him to cross-examine Burdick on the polygraph results or admit the polygraph results into evidence. After the trial court denied Father's request, Father made a bill of review on the record, which included a copy of the polygraph examination results.

45

did not offer an unredacted copy of Burdick's report.

We review the trial court's restriction on the scope of Father's cross-examination of Burdick for an abuse of discretion. *See Kramer v. Hollmann*, No. 02-11-00136-CV, 2012 WL 5869423, at *8 (Tex. App.—Fort Worth Nov. 21, 2012, no pet.) (mem. op.) (citing *Austin Rd. Co. v. Ferris*, 492 S.W.2d 64, 74 (Tex. Civ. App.—Fort Worth 1974, writ ref'd n.r.e.)).

The record reflects that over one third of Burdick's testimony was cross-examination by Father's counsel and that many of counsel's questions appear to have been calculated to demonstrate Burdick's alleged bias. Father's counsel asked Burdick whether she thought Father was involved in domestic violence, whether he was entitled to be agitated by CPS's involvement, whether she had accused him of being paranoid, and whether his actions in class and in session affected her willingness to counsel him further. At no point, however, did Father's counsel ask Burdick what she knew about A.B.'s injuries, whether she thought that Father had struck A.B., or whether she had any opinion about his alleged lack of remorse for A.B.'s injuries, and nothing in the record indicates that he was prevented from doing so.

Additionally, the record does not contain an unredacted copy of Burdick's report, thus we cannot evaluate whether the redacted version of the report gave the jury a false impression of her alleged bias. *See Sw. Country Enters., Inc. v. Lucky Lady Oil Co.*, 991 S.W.2d 490, 493–94 (Tex. App.—Fort Worth 1999, pet. denied); *see also* Tex. R. App. P. 33.1(a)(1)(B); Tex. R. Evid. 103(a)(2).

46

Moreover, polygraph examinations are inadmissible in civil cases. *In re W.B.W.*, No. 11-11-00269-CV, 2012 WL 2856067, at *16 (Tex. App.—Eastland July 12, 2012, pet. denied) (mem. op.). Consequently, we hold that the trial court did not abuse its discretion by refusing to allow Father to cross-examine Burdick on her comment about his polygraph examination. *See Kramer*, 2012 WL 5869423, at *8. We overrule Father's fifth point.

## IV. Conclusion

Having overruled Father's dispositive points, we affirm the trial court's judgment.


PER CURIAM

EN BANC

MCCOY, J.; LIVINGSTON, C.J.; GARDNER, MEIER, and GABRIEL, JJ.

WALKER, J., filed a dissenting opinion in which DAUPHINOT, J., joins.

DELIVERED:  August 8, 2013

47