**Affirmed and Memorandum Opinion filed October 19, 2017.**



In The

# Fourteenth Court of Appeals

## NO. 14-17-00376-CV

### IN THE INTEREST OF D.L.T., JR., CHILD

**On Appeal from the 310th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2015-27542**

## M E M O R A N D U M   O P I N I O N

The trial court terminated the parental rights of S.M. (Mother) with respect to her son, David,[1] and appointed the Texas Department of Family and Protective Services (the Department) to be David's managing conservator. On appeal, Mother challenges the legal and factual sufficiency of the evidence to support termination and asserts the trial court abused its discretion in appointing the Department as David's managing conservator. We affirm.

---

[1] David is a pseudonym. *See* Tex. R. App. P. 9.8(b)(2).

BACKGROUND

## A.    Removal

The following facts come from the affidavit of Department investigator Domeka Brown, as well as Brown's trial testimony.

The Department received three reports between March 30, 2015, and May 1, 2015, about eleven-year-old David's safety. According to the reports, Mother frequently enrolled and withdrew David from his elementary school in La Porte. He had been absent ten of the previous thirty school days. Mother and David had been spotted walking "all day and night." The reporters described David as sad and withdrawn and said he did not make eye contact. Mother and David reportedly did not have a safe place to live.

On April 1, 2015, Brown went to Mother's last known address, a local hotel, but could not find her or David. Three days later, a hotel receptionist said Mother and David had stayed there but Mother did not pay for the room, so the receptionist paid because she wanted David to have somewhere to stay. Mother and David left the hotel on April 1 or 2. On April 3, Mother returned to the hotel at 11:00 p.m. and sat in the lobby throughout the night, at which point the receptionist told Mother to leave.

David's school principal called Brown on April 7 and told her David returned to school. He reportedly was living with another student and her family. The student's mother, Monica, is Mother's aunt. Monica told Brown she had not seen Mother.

Investigator Nicole Hubbard spoke to the principal the next day. The principal said David started school at the beginning of the school year but was withdrawn in mid-December 2014. Since that time, Mother had behaved erratically. A staff

member of the school district had tracked Mother down, asked her if she needed help, and told her David needs to be in school. Mother responded by swearing at the officer and telling her to mind her own business.

On April 23, 2015, the principal called Brown and told her Mother was at the school attempting to withdraw David. Brown went to the school to talk with Mother. When she tried, though, Mother reportedly "began to take off her watch and charge [Brown] as if she wanted to fight." Campus police officers were able to deescalate the situation. Mother agreed to contact Brown the next day and submit to a drug test. David told Brown that Mother had gotten a job and they were moving to Baytown. Despite her promise, Mother did not call Brown the next day, and Brown was unable to get in touch with her.

Mother's cousin, Tonya, saw her and David walking along a very busy Pasadena highway near midnight on May 1, 2015. Tonya convinced Mother and David to come to Tonya's apartment. According to Tonya, David was very hungry and very tired. She fed him, which upset Mother, who said David had just eaten and "was fine." When Tonya was alone with David, David started to cry and said he did not want to leave with Mother. David stopped crying as soon as Mother walked into the room. Tonya said David would sit quietly with his head down and not talk to anyone when he was around Mother.

A Pasadena police officer came to Tonya's apartment in the middle of the night to talk with Mother and David. Mother denied there was a problem. She said she and David would be moving to Houston soon but would not specify where or when. David told the officer he and Mother lived on the streets most of the time and occasionally stayed with friends or family. He said they eat most days.

Brown found Mother outside a relative's house in La Porte on May 8, 2015. Mother charged Brown, swearing at her, threatening her, and putting up her fists.

3

After about thirty seconds of coming at Brown, Mother kicked Brown's car, denting it, then left on foot with David. Brown called the police, and Mother was arrested.

After Mother was gone, David told Brown he and Mother would walk from La Porte to Pasadena, to Baytown, and sometimes all the way to Houston. He said had not eaten for two days or bathed for four days. David was limping because his legs and feet hurt from walking so much.

Brown tried to find a family member who would care for David. One relative agreed to take him for the weekend only. One of Mother's cousins told Brown nobody in the family was willing to take David because they were scared of Mother. Mother's own mother was said to have a restraining order against her.

On May 11, 2015, Brown went to the Harris County jail, where Mother was incarcerated for vandalizing Brown's car. Brown gave Mother a notice of removal and told her David was being removed. Mother responded that David "better be at my aunt's house when I get out, or [expletive] I am going to find you and beat your [expletive]."

The Department filed suit the next day and attached Brown's affidavit to the original petition. The trial court signed an emergency order allowing the removal and naming the Department as David's temporary managing conservator.

## B.  Family service plan

Following a full adversary hearing the next week, the trial court signed an order requiring Mother to comply with any family service plan by the Department. The service plan would identify the tasks and services she needed to complete before David could be returned to her care.

The Department filed a service plan for Mother in July 2015. The plan required her to, among other things: complete parenting classes; obtain and maintain

suitable employment and stable housing; complete a substance abuse assessment and follow the assessor's recommendations; submit to random drug testing; complete a psychosocial evaluation and follow the evaluator's recommendations; refrain from criminal activity; and maintain regular contact with the caseworker.

Department caseworker Brian Lastrape met with Mother in early August 2015 to discuss the service plan and give her a copy. Mother refused to sign it. Lastrape asked for her address so he could arrange appointments with service providers geographically convenient to Mother. Mother said she was still homeless and did not provide an address.

## C.     Proceedings relating to mental health

Mother was arrested and charged in January 2016 for assaulting a jail officer who was escorting Mother to her cell. Following a psychological evaluation, the criminal court declared her incompetent to stand trial and ordered her committed for 120 days for competency restoration.

Based on the psychological evaluation, Mother's court-appointed lawyer in the termination case filed a motion in early February 2016 for the trial court to appoint a guardian ad litem for Mother. The motion indicated Mother appeared to have "a mental impairment or illness which limits her ability to participate in services or protect her parental rights." Appointment of a guardian ad litem was requested "as an accommodation to [Mother] to assist with appropriate implementation" of her family service plan. The trial court granted the motion at the end of February and appointed Cheryl Cohorn to be Mother's guardian ad litem.

Trial in the termination case was to begin in May 2016. Due to Mother's commitment, the trial court granted a continuance until August 30, 2016.

Mother was discharged from the psychiatric hospital in mid-July. Her criminal

case was resolved on August 23, 2016, and she was released from jail that day.

The trial court in the termination case held a permanency hearing on August 30, 2016. Following that hearing, the trial court directed the Department to set up supervised visits between Mother and David.

### D. Trial

Trial began on November 8, 2016, and continued into the next day. For reasons not apparent from the record, trial did not resume until April 18, 2017. Mother attended both days of trial in November but did not appear in April.

The Department presented testimony from caseworkers Domeka Brown and Brian Lastrape and Tonya, Mother's cousin, who had been caring for David for nearly a year. The Department's documentary evidence included Brown's removal affidavit, Mother's service plan, judgments of Mother's criminal convictions, and Mother's psychiatric records.

Mother did not testify. Her sole evidence was a copy of Appendix 3414 from the Department's Child Protective Services Handbook, entitled "Americans With Disabilities Act Reasonable Accommodations in Service Planning." David's attorney ad litem did not call witnesses or offer evidence.

#### 1. Evidence about Mother

*Mental illness.* Tonya offered significant insight into Mother's impaired mental health. According to Tonya, mental illness runs on Mother's side of the family. Tonya believed Mother had shown signs of mental illness for two or three years. Mother's aggression and combativeness stood out to Tonya, who said Mother had not acted in that manner when she was growing up. Mother consistently denied she had any mental illness and would yell and curse at anyone who offered to help. Family members would not allow Mother, who was homeless, to stay with them due

6

to her "attitude and aggression."

Lastrape described symptoms of mental illness he saw during two visits with Mother. He met with Mother in August 2015 at Taco Cabana to discuss her service plan. He explained it as best as he could, but he was not certain Mother understood it. When Lastrape visited her in jail several months later, she insisted he was not the man she met at Taco Cabana. She cursed and shouted and demanded the Department return David to her.

In January 2016, Mother's appointed lawyer in her assault case requested she be evaluated for her competence to stand trial. Counsel said Mother refused to speak to her or acknowledge she had been charged with a crime.

A psychologist from the Mental Health Mental Retardation Authority of Harris County (MHMRA) attempted to evaluate Mother on January 22, 2016. Mother refused to leave her cell and became combative when jail officers attempted to transport her to the evaluation room. The psychologist tried to conduct the evaluation at Mother's cell, but Mother refused to participate. When she did speak, her tone was aggressive and argumentative and her thinking was illogical. The evaluation was terminated at Mother's request. The psychologist wrote a report of her evaluation in which she opined Mother was incompetent to stand trial.

Cheryl Cohorn was appointed in late February 2016 to be Mother's guardian ad litem in the termination case. She first met Mother in jail, at which time Mother was hostile and aggressive and Cohorn could not communicate with her. She attended Mother's criminal proceedings but was unable to communicate effectively with her in that setting, either. In Cohorn's opinion, Mother was "very mentally ill."

In March 2016, the criminal court found Mother incompetent to stand trial. The court signed an order of initial commitment for 120 days to a "maximum

security facility designated by the Texas Department of State Health Services" for competency restoration. *See* Tex. Code Crim. Proc. Ann. art. 46B.073 (West 2006 & Supp. 2016) (governing commitment for competency restoration). Based on that order, Mother was admitted on April 11, 2016, to the Palestine Regional Medical Center (PRMC).

PRMC records indicate Mother was extremely irritable, labile, paranoid, and uncooperative upon admission and over the next several weeks. She denied mental illness and said she just had premenstrual syndrome. She was diagnosed with mood disorder, non-specific, and psychosis, non-specific. Medical staff recommended Mother take antipsychotic medication. She refused for nearly two months.

In early June 2016, Mother agreed to take the recommended medication. Her doctor noted within a day or two that she appeared to be doing much better and her lability of mood had improved significantly. Over the next several weeks, Mother demonstrated logical thinking and awareness of the reality of her situation, was goal oriented, and enjoyed overall stabilization of her mood.

Mother was discharged from PRMC on July 14, 2016, with her competency restored. On August 23, 2016, the criminal court found her competent to stand trial, accepted the plea bargain agreement between Mother and the State, deferred an adjudication of guilt, and placed Mother on community supervision for one year.

Lastrape met with Mother on August 30, 2016, to set up a visit with David and go over her service plan. She acted appropriately during that meeting and when she visited David within the next couple of weeks.

During the five months between the second and third days of trial, however, Mother's mental health seemed to deteriorate. Tonya said Mother was distant and did not speak the last time she visited David, on March 9, 2017. In mid-April, Tonya

8

and David were at a family member's house when Mother walked by with a big duffel bag full of clothes. David did not want to hug her, so Mother made an obscene gesture to Tonya. Mother said she was staying with her sister, but that sister called Tonya looking for Mother. Tonya believed Mother was walking "somewhere in La Porte" on the third day of trial.

By contrast, Cohorn believed Mother was mentally stable. She testified MHMRA was treating Mother and making house calls to deliver Mother's medication. Her belief was based solely on Mother's statements to that effect. Cohorn had no proof that Mother was actually being treated or medicated. Still, she was confident in her opinion:

> If [Mother] wasn't doing what she needed to be doing with MHMRA, I would know it. . . . Because if she wasn't taking her medication, it would — she needs her medication due to her mental illness, and I feel like it would be obvious because she would be deteriorating.

*Criminal history.* The earliest criminal activity shown in the record is Mother's vandalism of Brown's car in May 2015, for which she pleaded guilty to criminal mischief. Over the next five months, she was charged with six more crimes — four instances of criminal trespass, one theft, and one assault. One of the criminal trespass charges was dismissed. She pleaded guilty to each remaining charge.

Mother assaulted a jail officer in January 2016 while serving her sentence for one or more of her convictions. As noted above, once she was found competent to stand trial for that offense, she pleaded guilty and was placed on community supervision.

Lastrape testified Mother was arrested and jailed again sometime between August 30, 2016, and the beginning of trial in early November 2016. The record contains no further information about that arrest.

9

***Service plan.*** Early in the case, Mother contacted Lastrape two or three times to check on David. After that, she was either in jail or non-communicative. Lastrape testified he tried to help Mother with her services, but he could not reach her:

> [After Mother was released from jail in August 2016], I started with the visit because we allowed her to start having visitation. And then I asked for an address so I could set up services in her area. Then she moved. Then I lost contact for a while. And then I tried to contact her a few more times to set up visits. So, I wasn't really able to engage her into doing services.

Lastrape last saw Mother on March 9, 2017, during her visit with David. He called her cell phone twice between that day and the third day of trial but did not reach her.

On cross-examination, Lastrape acknowledged Mother could not have worked towards fulfilling her service plan while she was in jail. He recognized he could have done more to help Mother comply with her service plan, such as providing her with bus tokens so she could have reliable transportation to her appointments. He also admitted he did not make formal requests for particular services. But, he noted, to make a formal request, he had to know the locations the services would be provided, and he did not know those locations because Mother was transient and would not give him an address.

Cohorn believed her role as Mother's guardian ad litem was "to interface between" the Department and Mother. Despite that view, Cohorn did not contact the Department to facilitate services for Mother. Nor did she help Lastrape get in touch with Mother, even though Cohorn had a system in place for speaking with Mother by phone and had spoken to her the week before trial resumed in April 2017.

### 2. Evidence about David

***Time of removal.*** Tonya saw David many times during the two-year period she believed he and Mother were homeless. She felt David was in danger at those

times because he was not eating regularly and did not have a safe place to sleep. Tonya testified she saw David walking with Mother more than thirty times before he was removed. She always offered to take David home with her and let Mother come get him when she "got herself together," but Mother refused. Tonya said Mother used drugs in David's presence.

On May 1, 2015, the night Tonya convinced Mother and David to come to her apartment, David appeared to have lost weight. He was very tired and very hungry. David was conflicted, both fearing Mother and not wanting to leave her. He spoke privately to Tonya but would not say anything when Mother was in the room.

Lastrape described David as being withdrawn and quiet at the beginning of this case:

> When he first came into care, he was very withdrawn. He wouldn't talk much. He would just agree and shake his head. When he was at the boys and girls club, the first placement, he was — it was like, you know, he was existing. You know, he wasn't happy, he wasn't sad, but he [sic] was more like he was existing.

***Progress and placement.*** David was placed with Tonya a few months after removal, and Tonya's home would be his last placement. As of the final day of trial, David had lived with Tonya for about a year and a half. Tonya described his emotional progress during that period:

> [W]hen I first got [David], [David] was in a shell. It's like he wouldn't — he wouldn't go out the house. He wouldn't — now he's this child that is striving to be all that he can be pretty much. And he's outgoing. He loves to talk. He loves music and stuff like that, so [sic] he couldn't do that once upon a time. So it's like he's this better kid, like he's an awesome kid . . . .

Lastrape said Tonya's home was safe and stable and met all of David's needs. He testified David loved school, was on the honor roll, and played in the school

11

orchestra.

*Needs and desires.* David had no special physical, emotional, or educational needs. He was in therapy for a time, then successfully discharged on the therapist's recommendation.

In the early stages of this case, David wanted to visit Mother so he could ensure she was okay. Visitations were not possible due to a no-contact order. Once the order was lifted, David had two official visits with Mother and sometimes saw her at church and family events.

By the time of the second visit, just a month before the third day of trial, David's desire to see Mother had waned. Tonya said he pulled his shirt over his face and did not want to stay. The visit was supposed to be two hours, but Mother left after an hour because, in Lastrape's opinion, she was frustrated. David was relieved the visit was finished.

Tonya testified David had some "breakdowns" after he started seeing Mother more regularly. She said:

> [H]e gets, like, by himself. It took me a long time to work through, like, him [sic] out of his shell. And once he goes to see his mom, he gets in his little shell and he doesn't —and sometimes he'll cry, like, "I don't want. I don't want to go. I don't want."

Tonya arranged for David to return to therapy to help him deal with his feelings. Lastrape believed it would be detrimental to David to force him to see Mother.

David has two older siblings, a 22-year-old brother and an 18-year old sister. Tonya said the brother visited David "all the time." Lastrape encouraged contact between David and his siblings.

### 3. Plans for the future

Tonya and Lastrape both testified David wants Tonya to adopt him. Tonya

said she wants and is able to adopt David and care for him for the rest of his childhood. According to Lastrape, David wants to be adopted to be sure that Mother cannot take him away from Tonya:

> He's expressed if he was adopted, he knows that's a permanent placement for him, that his mom cannot come and remove him from the care of his caregiver. And that's what he's been fearful of throughout the duration of this case

David was angry, Lastrape reported, at the suggestion of Mother's rights not being terminated. David told Lastrape "no mother should walk their kids up and down the street." Lastrape testified it was in David's best interest to terminate Mother's parental rights because she cannot provide a safe and stable environment for him.

Cohorn testified it was not in Mother's best interest for her rights to be terminated. She believed Mother loved David very much and being able to keep him would motive her to improve. Cohorn acknowledged the issue for the trial court is David's best interest, but she believed the focus should be on the family and the parent's best interest should be considered. Cohorn never met David.

Tonya would let David live with her even if Mother's parental rights were not terminated. Unlike other members of their family, Tonya said she is not afraid of Mother, and she will not let Mother near David when she is off her medication.

### 4. Trial court's findings

The trial court found Mother engaged in the conduct described in subsections D and E (both concerning endangerment of a child), N (constructive abandonment), and O (failure to comply with a court-ordered service plan) of section 161.001(b)(1) of the Family Code. The court additionally found termination of Mother's parental rights was in David's best interest. The trial court appointed the Department to be David's managing conservator. Mother timely appealed.

ANALYSIS

## I.    Burden of proof and standards of review

Involuntary termination of parental rights is a serious matter implicating fundamental constitutional rights. *See In re G.M.*, 596 S.W.2d 846, 846 (Tex. 1980); *In re S.R.*, 452 S.W.3d 351, 357 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). Although parental rights are of constitutional magnitude, they are not absolute. The child's emotional and physical interests must not be sacrificed merely to preserve the parent's rights. *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002).

Due to the severity and permanency of the termination of parental rights, the burden of proof is heightened to clear and convincing evidence. *See* Tex. Fam. Code Ann. § 161.001 (West 2014 & Supp. 2016); *In re J.F.C.*, 96 S.W.3d 256, 265–66 (Tex. 2002). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (West 2014); *accord J.F.C.*, 96 S.W.3d at 264. This heightened burden of proof results in a heightened standard of review. *S.R.*, 452 S.W.3d at 358.

Parental rights can be terminated upon clear and convincing evidence that (1) the parent committed an act described in section 161.001(b)(1) of the Family Code, and (2) termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001(b). Only one predicate finding under section 161.001(b)(1) is necessary to support a decree of termination when there is also a finding that termination is in the child's best interest. *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

In reviewing the legal sufficiency of the evidence in a termination case, we must consider all the evidence in the light most favorable to the finding to determine whether a reasonable fact finder could have formed a firm belief or conviction that its finding was true. *See In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009); *J.F.C.*, 96

14

S.W.3d at 266; *C.H.*, 89 S.W.3d at 25. We assume the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so, and we disregard all evidence a reasonable fact finder could disbelieve. *J.O.A.*, 283 S.W.3d at 344; *J.F.C.*, 96 S.W.3d at 266.

In reviewing the factual sufficiency of the evidence, we consider and weigh all the evidence, including disputed or conflicting evidence. *See J.O.A.*, 283 S.W.3d at 345. "If, in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *J.F.C.*, 96 S.W.3d at 266. We give due deference to the fact finder's findings, and we cannot substitute our own judgment for that of the fact finder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam). The fact finder is the sole arbiter when assessing the credibility and demeanor of witnesses. *Id.* at 109. We are not to "second-guess the trial court's resolution of a factual dispute by relying on evidence that is either disputed, or that the court could easily have rejected as not credible." *In re L.M.I.*, 119 S.W.3d 707, 712 (Tex. 2003).

## II.     Predicate ground for termination: Endangerment (subsection E)

In her first four issues, Mother challenges the legal and factual sufficiency of the evidence to support the trial court's findings under subsections D, E, N, and O of section 161.001(b)(1) of the Family Code. We conclude the evidence is legally and sufficient to support the trial court's subsection E finding. Accordingly, we do not review the findings under subsections D, N, or O. *See A.V.*, 113 S.W.3d at 362.

### A.     Legal standards

Subsection E of Family Code section 161.001(b)(1) requires clear and convincing evidence that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or

emotional well-being of the child." Tex. Fam. Code Ann. § 161.001(b)(1)(E). "To endanger" means to expose a child to loss or injury or to jeopardize a child's emotional or physical health. *See In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996); *S.R.*, 452 S.W.3d at 360. "Conduct" includes acts and failures to act. *See In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.).

A finding of endangerment under subsection E requires evidence the endangerment was the result of the parent's conduct, including acts, omissions, or failures to act. *Id.* Termination under subsection E must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. *Id.* A court properly may consider actions and inactions occurring both before and after a child's birth to establish a "course of conduct." *In re S.M.*, 389 S.W.3d 483, 491–92 (Tex. App.—El Paso 2012, no pet.). While endangerment often involves physical endangerment, the statute does not require that conduct be directed at a child or that the child actually suffer injury. Rather, the specific danger to the child's well-being may be inferred from the parent's misconduct alone. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re R.W.*, 129 S.W.3d 732, 738–39 (Tex. App.—Fort Worth 2004, pet. denied). A parent's conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *In re A.B.*, 412 S.W.3d 588, 599 (Tex. App.—Fort Worth 2013), *aff'd*, 437 S.W.3d 498 (Tex. 2014).

The parent's conduct both before and after the Department removed the child from the home is relevant to a finding under subsection E. *See Avery v. State*, 963 S.W.2d 550, 553 (Tex. App.—Houston [1st Dist.] 1997, no writ) (considering persistence of endangering conduct up to time of trial); *In re A.R.M.*, No. 14-13-01039-CV, 2014 WL 1390285, at *7 (Tex. App.—Houston [14th Dist.] Apr. 8, 2014, no pet.) (mem. op.) (considering criminal behavior and imprisonment through trial).

## B.    Application

### 1.    Untreated mental illness

Mental illness alone is not grounds for terminating the parent-child relationship. *S.R.*, 452 S.W.3d at 363. Untreated mental illness, however, can expose a child to endangerment and is a factor the court may consider. *Id.*; *see In re A.L.H.*, 515 S.W.3d 60, 91 (Tex. App.—Houston [14th Dist.] 2017, pet. ref'd) (considering parent's persistent and untreated mental illness as evidence of endangerment); *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.) (considering parent's mental health and noncompliance with medication schedule as factors in endangering child).

Three facts readily emerge from the record about Mother's mental health. First, she unquestionably suffers from mental illness. Second, she rarely consents to medication or other psychiatric treatment. Third, when she is properly medicated, Mother's symptoms abate dramatically, and she is able to function.

Although Cohorn believed Mother was being treated for her mental illness, Tonya disagreed. And Mother failed to appear at her trial on the last day. Tonya believed she was "out walking" in La Porte — the same behavior to which she previously exposed David. The court was free to believe Tonya's testimony over Cohorn's, especially since Mother failed to appear for trial. Although Mother faults the Department for not getting her treatment earlier, it appears Mother was not maintaining her treatment.

One can reasonably infer that Mother's untreated mental illness harms David both physically and emotionally. David walked so much with Mother that he limped from pain in his legs and feet. He was exhausted from walking and from not having a safe place to sleep at night. He sometimes went hungry. On an emotional level, David was stressed, scared, and deeply conflicted by his simultaneous love and fear

17

of Mother. He was withdrawn and just "existing."

### 2. Criminal activity

Evidence of criminal conduct, convictions, or imprisonment is relevant to a review of whether a parent engaged in a course of conduct that endangered the well-being of the child. *S.R.*, 452 S.W.3d at 360–61; *A.S. v. Tex. Dep't of Family & Protective Servs.*, 394 S.W.3d 703, 712–13 (Tex. App.—El Paso 2012, no pet.). Imprisonment alone does not constitute an endangering course of conduct but is a fact properly considered on the endangerment issue. *Boyd*, 727 S.W.2d at 533–34. Routinely subjecting a child to the probability that he will be left alone because his parent is in jail endangers the child's physical and emotional well-being. *S.M.*, 389 S.W.3d at 492.

Mother was charged with seven crimes in five months. One charge was dismissed, and she pleaded guilty to the remaining six. While serving her sentence on one or more of those crimes, she committed an eighth crime by assaulting a jail officer. Proceedings regarding that assault lasted seven months from beginning to end, including her being declared incompetent to stand trial and committed for competency restoration. Lastrape testified Mother was arrested again sometime between August 30, 2016, and the first day of trial.

### 3. Conclusion on endangerment

The evidence shows Mother's untreated mental illness and criminal activity endangered David. Considering all the evidence in the light most favorable to the endangerment finding, we conclude the trial court reasonably could have formed a firm belief or conviction that Mother engaged in conduct described in subsection E. Further, in light of the entire record, we conclude the disputed evidence the trial court could not reasonably have credited in favor of its endangerment finding is not so significant that the court could not reasonably have formed a firm belief or

conviction that Mother endangered David. Accordingly, the evidence is legally and factually sufficient to support the trial court's finding under subsection E. We overrule Mother's first four issues.

## III. Best interest

Mother's fifth issue challenges the legal and factual sufficiency of the evidence to support the trial court's finding that termination of her parental rights is in David's best interest.

### A. Legal standards

Termination must be in the child's best interest. Tex. Fam. Code Ann. § 161.001(b)(2). Prompt, permanent placement of the child in a safe environment is also presumed to be in the child's best interest. *Id.* § 263.307(a) (West 2014 & Supp. 2016). There is a strong presumption that the best interest of a child is served by keeping the child with the child's parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam).

Courts may consider the following non-exclusive factors in reviewing the sufficiency of the evidence to support the best-interest finding: the desires of the child; the physical and emotional needs of the child now and in the future; the physical and emotional danger to the child now and in the future; the parental abilities of the persons seeking custody; the programs available to assist those persons seeking custody in promoting the best interest of the child; the plans for the child by the individuals or agency seeking custody; the stability of the home or proposed placement; acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate; and any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). As noted, this list of factors is not exhaustive, and evidence is not required on all the factors to support a finding that termination is in the child's best interest. *In re D.R.A.*, 374

19

S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.). *See also* Tex. Fam. Code Ann. § 263.307(b) (setting out factors to be considered in evaluating a parent's willingness and ability to provide the child with a safe environment).

### B. Application

#### 1. David

The evidence is undisputed that David was in a poor state at the time of removal, just "existed" in his first placement, and thrived during his eighteen months with Tonya. He had no special needs to be accommodated. Tonya was meeting his needs. David enjoyed school and was performing well academically.

David wanted Tonya to adopt him. Both Tonya and the Department agreed adoption was in David's best interest. He did not want to see Mother, and he feared Mother would take him away from Tonya if he was not adopted.

#### 2. Mother

*Endangerment.* The evidence of Mother's endangerment of David discussed above is important to the best-interest analysis. *See S.R.*, 452 S.W.3d at 366.

*Lack of stable housing.* The record suggests Mother did not have stable housing at the time of trial. Though she periodically stayed with family members, she had no legal right to live in their homes and was dependent on their good will.

*Failure to complete service plan.* Mother did not complete or come close to completing her service plan. At trial, she focused on her inability to work on her services while she was in jail. She also suggested her mental illness contributed to her criminal activity and prevented her from making progress on her service plan. But the trial court was free to decide that Mother bore at least some responsibility for her circumstances because she repeatedly committed crimes and usually refused psychiatric treatment.

### 3.      Conclusion on best interest

Considering all the evidence in the light most favorable to the best-interest finding, we conclude the trial court reasonably could have formed a firm belief or conviction that termination of Mother's parental rights was in David's best interest. *See J.O.A.*, 283 S.W.3d at 344; *J.F.C.*, 96 S.W.3d at 266; *C.H.*, 89 S.W.3d at 25. Further, in light of the entire record, we conclude the disputed evidence the trial court could not reasonably have credited in favor of its best-interest finding is not so significant that the court could not reasonably have formed a firm belief or conviction that termination of her rights was in David's best interest. Accordingly, the evidence is legally and factually sufficient to support the trial court's finding that termination is in David's best interest. We overrule Mother's fifth issue.

## IV.   Managing conservatorship

In her sixth issue, Mother argues the trial court erred in naming the Department as David's managing conservator. The Texas Family Code creates a rebuttable presumption a parent will be named a child's managing conservator unless the court finds such appointment would not be in the child's best interest "because the appointment would significantly impair the child's physical health or emotional development." Tex. Fam. Code Ann. § 153.131(a) (West 2014). The trial court made that finding in this case.

If the trial court terminates the parent-child relationship with respect to both parents or to the only living parent, "the court shall appoint a suitable, competent adult, the Department of Family and Protective Services, or a licensed child-placing agency as managing conservator of the child." Tex. Fam. Code Ann. § 161.207(a) (West 2014 & Supp. 2016). In this case, upon termination of Mother's parental rights, the Department was appointed David's sole managing conservator.

Termination of parental rights and appointment of a non-parent as sole

21

managing conservator are distinct issues, involving different elements, different standards of proof, and different standards of review. *Compare* Tex. Fam. Code Ann. § 161.001 *with* Tex. Fam. Code Ann. § 153.131(a); *see also In re J.A.J.*, 243 S.W.3d 611, 615–17 (Tex. 2007). Additionally, "[t]he best interest of the child shall always be the primary consideration of the court in determining the issues of conservatorship[.]" Tex. Fam. Code Ann. § 153.002.

Unlike the standard of proof for termination of parental rights, the findings necessary to appoint a non-parent as sole managing conservator need be established by a mere preponderance of the evidence. *See* Tex. Fam. Code Ann. § 105.005 (West 2014); *J.A.J.*, 243 S.W.3d at 616. The standard of review for the appointment of a non-parent as sole managing conservator is also less stringent than the standard of review for termination of parental rights. *J.A.J.*, 243 S.W.3d at 616. We review a trial court's appointment of a non-parent as sole managing conservator for abuse of discretion only. *Id.* Therefore, we may reverse the trial court's appointment of a non-parent as sole managing conservator only if we determine the appointment is arbitrary or unreasonable. *Id.*

Having made termination findings on the predicate grounds and best interest, the trial court was required under section 161.207 of the Family Code to appoint the Department, or another permissible adult or agency, as David's managing conservator. *See In re C.N.S.*, No. 14-14-00301–CV, 2014 WL 3887722, at *13 (Tex. App.—Houston [14th Dist.] Aug. 7, 2014, no pet.) (mem. op.). The appointment may be considered a "consequence of the termination." *In re J.R.W.*, No. 14-12-00850–CV, 2013 WL 507325, at *12 (Tex. App.—Houston [14th Dist.] Feb. 12, 2013, pet. denied) (mem. op.).

As discussed, the evidence is legally and factually sufficient to support the trial court's termination findings. Mother provides no authority for her implicit

22

contention that the presumption in section 153.131(a) applies to a parent whose parental rights have been terminated. *See In re A.W.B.*, No. 14-11-00926–CV, 2012 WL 1048640, at \*7 (Tex. App.—Houston [14th Dist.] Mar. 27, 2012, no pet.) (mem. op.). Nor did she prove she is a "suitable, competent adult" as contemplated by section 161.207(a). *See id.* Accordingly, Mother's challenge to the trial court's appointment of the Department, rather than her, as David's sole managing conservator is without merit. We overrule her sixth issue.

## CONCLUSION

We affirm the trial court's judgment.


/s/    Tracy Christopher
Justice


Panel consists of Justices Christopher, Brown, and Wise.